*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0111p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

  *v.*

MARVIN CHARLES GABRION, II,

    *Defendant-Appellant.*

Nos. 02-1386/1461/1570

>

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 99-00076—Robert Holmes Bell, Chief District Judge.

Argued: February 28, 2007

Decided and Filed: March 14, 2008

Before: MERRITT, BATCHELDER, and MOORE, Circuit Judges.

---

### COUNSEL

**ARGUED:** Judy C. Clarke, FEDERAL DEFENDERS OF SAN DIEGO, San Diego, California, Margaret S. O'Donnell, McNALLY & O'DONNELL, Frankfort, Kentucky, for Appellant. Joan E. Meyer, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Judy C. Clarke, FEDERAL DEFENDERS OF SAN DIEGO, San Diego, California, Margaret S. O'Donnell, Kevin M. McNally, McNALLY & O'DONNELL, Frankfort, Kentucky, for Appellant. Joan E. Meyer, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

   BATCHELDER, J., delivered the opinion of the court. MOORE, J. (pp. 16-32), delivered a separate opinion concurring in the judgment. MERRITT, J. (pp. 33-42), delivered a separate dissenting opinion.

---

### OPINION

---

   ALICE M. BATCHELDER, Circuit Judge. In this appeal from a federal criminal conviction, we are confronted with the precursory issue of whether a district court has subject matter jurisdiction over a criminal prosecution for murder — the federal statute for which predicates subject matter jurisdiction on the murder's having been committed on certain federal property — when the property in question is within the national forest. The dispositive question is whether certain national forest land falls within the federal government's territorial jurisdiction. Because, in this case, *it does*, the district court had subject matter jurisdiction over this criminal prosecution.

1

## I.

On June 3, 1999, the United States Attorney, acting on the finding of the federal grand jury sitting in the United States District Court for the Western District of Michigan, charged Marvin Gabrion with committing first degree murder, 18 U.S.C. § 1111(a), at a location within the federal government's special maritime and territorial jurisdiction, 18 U.S.C. § 7(3), which is a capital felony under 18 U.S.C. § 1111(b).[1]  The text of the indictment reads, in its entirety:

> Between on or about June 3, 1997, and on or about July 5, 1997, in the County of Newaygo, in the Southern Division of the Western District of Michigan, Marvin Charles Gabrion II did, after deliberation, premeditation and malice aforethought, willfully kill Rachel Timmerman within the special maritime and territorial jurisdiction of the United States by drowning her in Oxford Lake, which lies within the Manistee National Forest.
>  18 U.S.C. § 1111
>  18 U.S.C. § 7

Indictment, Case No. 1:99-CR-76 (W.D. Mich. June 3, 1999).[2]  The first statute cited in the indictment, the federal murder statute, provides in pertinent part:

> (a)  Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree.
>
> . . .
>
> (b)  Within the special maritime and territorial jurisdiction of the United States, [w]hoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life[.]

18 U.S.C. § 1111.  Congress has defined the "special maritime and territorial jurisdiction of the United States" to include "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof."  18 U.S.C. § 7(3).

Following a six-day trial, a jury convicted Gabrion as charged and the district court sentenced him to death.  *See United States v. Gabrion*, No. 1:99-CR-76, 2006 U.S. Dist. LEXIS

---

[1] Just to be abundantly clear, this case does not involve any *state* criminal law.  It involves a violation of federal law, namely 18 U.S.C. § 1111 (murder), meaning that the crime at issue, murder, has been made punishable by an enactment of Congress, and therefore, the Assimilative Crimes Act, 18 U.S.C. § 13(a), which applies to state-law-based crimes "not made punishable by any enactment of Congress," is neither applicable nor relevant.

[2] On February 14, 2002, the United States Attorney, acting on the finding of the federal grand jury, entered a "Superseding Indictment," the text of which reads, in its entirety:

> Between on or about June 3, 1997, and on or about July 5, 1997, in the County of Newaygo, in the Southern Division of the Western District of Michigan, Marvin Charles Gabrion II did, after deliberation, premeditation and malice aforethought, willfully kill Rachel Timmerman within the special maritime and territorial jurisdiction of the United States, specifically in the Manistee National Forest.
>  18 U.S.C. § 1111
>  18 U.S.C. § 7

Superseding Indictment, Case No. 1:99-CR-76 (W.D. Mich. Feb. 14, 2004).  This superceding indictment omitted the "by drowning her in Oxford Lake" accusation, but did not alter any other aspect of the charge.  The present decision, which involves only subject matter jurisdiction, offers no opinion as to the sufficiency of either indictment.

60578 at *1, 2006 WL 2473978 at *1 (W.D. Mich. Aug. 25, 2006) ("Defendant Marvin Gabrion was convicted of first degree murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111 and 18 U.S.C. § 7. The Court imposed a sentence of death pursuant to 18 U.S.C. § 3594 in accordance with the jury's recommendation." (footnote omitted)). Gabrion appealed the conviction and his court-appointed appellate counsel asserted 23 claims of error.[3] Gabrion himself, in a *pro se* supplemental brief, asserted at least three additional claims.

Upon reviewing the briefs, the panel was intrigued by a "curious issue of jurisdiction" that had not been addressed by the district court, but had nonetheless been raised on appeal, although only in footnotes to the appellate briefs. Specifically, Gabrion's counsel had noted:

> The government never presented any evidence proving that in 1938 when the Manistee National Forest was created and then in 1939 when the particular land surrounding the southern portion of Oxford Lake was sold to the federal government that the government gave proper notice of its acceptance of jurisdiction. *Adams v. United States*, 319 U.S. 312 (1943) ('Since the government had not accepted jurisdiction [of Camp Claiborne, Louisiana in the manner required by the Act of October 9, 1940] the federal court had no jurisdiction' over rape prosecution). Gabrion filed several *pro se* motions relevant to the jurisdiction question. In one, he raised the question of whether the federal government, pursuant to 40 U.S.C. § 255, had ever properly accepted jurisdiction in 1939 of the land surrounding Oxford Lake that became part of the Manistee National Forest. Gabrion tried to argue his *pro se* motions at the jurisdiction evidentiary hearing, but the court would not let him speak.

Appellant's Final Br. at 24, fn. 20 (Dec. 12, 2005) (brackets in original; record citations omitted). The government reciprocated with a footnote in its own brief, in which it noted:

> Defendant now argues that the federal government never formally accepted jurisdiction over the southern portion of Oxford Lake pursuant to 40 U.S.C. § 255. *See Adams v. United States*, 319 U.S. 312 (1943). Defendant did not litigate this issue in the trial court and his own expert conceded federal ownership of the southern portion of Oxford Lake at hearing. In any event, 40 U.S.C. § 255 was enacted in 1940. For lands acquired prior to 1940, federal jurisdiction is presumed. *United States v. Johnson*, 426 F.2d 1112, 1114 (7th Cir.), *cert. denied*, 400 U.S. 842 (1970); *Markam v. United States*, 215 F.2d 56 (4th Cir. 1954), *cert. denied*, 348 U.S. 939 (1955); *see also SRA Inc. v. Minnesota*, 327 U.S. 558, 563 n.7 (1946). The southern portion of Oxford Lake was acquired for the Manistee National Forest in 1939.

Appellee's Final Br. at 72, fn. 10 (Dec. 5, 2005) (record citations omitted).

Thus, on our own initiative and prior to argument, we ordered the parties to "further brief what appears to be a subject matter jurisdiction issue raised for the first time in this case only in footnote 20 on page 24 of defendant's opening brief and discussed briefly in the government's brief at footnote 10 at page 71." Order (6th Cir. Mar. 6, 2006). We explained that this "issue arises from 40 U.S.C. § 255[,] which says that the government must first give notice that it is asserting law enforcement jurisdiction before it displaces the State's jurisdiction," and expressed our concern that the Supreme Court, in *Adams*, 319 U.S. at 315, "seems to have regarded such notice as a matter of

---

[3] The concurrence provides some thoughtful analysis of some of these claims, such as Gabrion's complaints regarding due process, equal protection, sufficiency of the evidence, and the jury instructions. But, at this stage of the proceeding — prior to argument on these issues — a decision or opinion on these issues would be premature.

subject matter jurisdiction." *Id*. We also issued to the parties six specific questions,[4] the answers to which, we hoped, would assist us in resolving this heretofore unaddressed jurisdictional issue.

Rather than responding with supplemental briefing, however, the parties filed a "Joint Motion to Remand for Hearing on Subject Matter Jurisdiction," in which they explained:

> The exercise of federal prosecutorial power over lands in national forests is dependent upon the date and method of land acquisition, and the relevant state statute, if any, authorizing that acquisition. After preliminary research, the parties jointly ask for a remand to further develop the record. This issue was never litigated in the district court so that, beyond establishing the bare minimum of the date the land was acquired, the record on appeal does not contain details related to the method of acquisition, how the land was acquired and held by the Forest Service, or the title history of the particular tract. Moreover, expert testimony may be necessary to explain various issues related to land acquisition by the federal government in the early 20th century and better inform the Court as to the respective arguments of both parties. In addition, although this Court reviews jurisdictional issues *de novo*, it will allow the district court to hear testimony and better inform the Court with further development of the record and its own legal analysis of the issue.

Upon consideration of this request, we granted the parties' motion and instructed the district court on remand to "hold such further proceedings as it determines are appropriate to fully develop the record on subject matter jurisdiction." Order (6th Cir. Apr. 6, 2006).

On remand, the district court accepted additional briefing and held an evidentiary hearing to expand the record. At that hearing, Gabrion introduced 24 exhibits and the testimony of three witnesses, the government introduced nine additional exhibits, and the parties entered a stipulation:

> It is stipulated and agreed between the parties that the United States does not possess records of notice filings pursuant to 40 U.S.C. § 255 for the Manistee National Forest. In the absence of records reflecting [that] such notice has been given, [] it must be conclusively presumed at this time that no jurisdiction was accepted for those post February 1, 1940 parcels.

Confronted with this accumulation of evidence and the parties' revised arguments, the district court explained: "The parties' briefings in this Court have gone beyond the limited inquiry into the notice provisions of 40 U.S.C. § 255. They have focused on the manner in which the United States acquired the property that comprises the Manistee National Forest, and the United States' policies

---

[4] The six questions we posed to the parties were as follows:

(1)     Does the government concede that the notice referred to in 40 U.S.C. § 255 has not been filed with respect to the Manistee National Forest?

(2)     If no notice has been filed establishing jurisdiction, does this Court[,] and [did] the court below[,] have subject matter jurisdiction over this federal capital case?

(3)     Does *Adams v. United States*, *supra*, control the disposition of the issue, or does subsequent legislation or case law from the Supreme Court alter the holding of that case?

(4)     Does § 255 apply retroactively to interests acquired before enactment of the statute?

(5)     Does any Michigan statute provide a grant of law enforcement authority to the federal government over Manistee National Forest?

(6)     Any other information or argument relevant to this issue of jurisdiction?

Order (6th Cir. Mar. 6, 2006).

regarding the acquisition of jurisdiction over national forest land." *Gabrion*, No. 1:99-CR-76, 2006 U.S. Dist. LEXIS 60578 at *1, 2006 WL 2473978 at *1.  From this, the district court drafted an opinion documenting its findings of fact and, through a methodical analysis in which it addressed each of Gabrion's several arguments, rendered conclusions of law, ultimately concluding "that the United States had [concurrent] jurisdiction to prosecute crimes occurring on the Oxford Lake parcel of the Manistee National Forest."  *Id.* at 2006 U.S. Dist. LEXIS 60578 at *31, 2006 WL 2473978 at *10.  Consequently, the district court held that it had subject matter jurisdiction over the trial, and hence, authority to enter the order of conviction and impose the prescribed punishment.

Gabrion appealed and the parties submitted supplemental briefs on the limited issue of subject matter jurisdiction.  In his supplemental brief to this court, Gabrion explained:

> It was Gabrion's position on remand and now on appeal that the United States never had any jurisdiction, exclusive, concurrent, partial, or otherwise over the Manistee National Forest because the federal government's interest in federal forest lands has always, even prior to February 1, 1940 (the date 40 U.S.C. § 255 was enacted), been of a proprietorial nature.  And, because the United States' interest in the Manistee National Forest is only proprietorial, the District Court did not have subject matter jurisdiction to prosecute Marvin Gabrion for the murder of Rachel Timmerman.

Appellant's Supp. Br. at 2-3 (Feb. 2, 2007).  The government responded with 38 pages in support of its fundamental proposition that "concurrent jurisdiction was ceded to the federal government at the time of acquisition of the Oxford Lake parcel and it remains to this day."  Appellee's Supp. Br. at 2 (Feb. 7, 2007).  In his reply brief, Gabrion sought to specify the issues in dispute:

> Marvin Gabrion does not disagree with much of the government's primer on federal jurisdiction setting forth the manner by which the federal government has over the course of time obtained jurisdiction over federal land.  What Gabrion disagrees with the government about is (1) the nature of the jurisdiction offered by the state of Michigan and accepted by the federal government in 1923, (2) the interpretation of and evidentiary value of the government's own jurisdictional reports as well as the USDA's legal memoranda, and, (3) the interpretation of 16 U.S.C. § 480.

Appellant's Supp. Reply Br. at 1 (Feb. 9, 2007) (citations omitted).

In one sense, then, we are back to the beginning and the issue before us is generally the same: Section 1111(b) empowers the federal courts to impose punishment for murders committed "[w]ithin the special maritime and territorial jurisdiction of the United States"; Section 7(3) defines that "special maritime and territorial jurisdiction" as including "lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof"; and consequently, the question to be answered is whether the Manistee National Forest is under federal jurisdiction.  But, in another sense, we confront this issue from a new perspective, informed and educated by the additional record evidence, the district court's opinion, and the parties' supplemental briefing.  For the reasons that follow, we hold, without regard to the merits of Gabrion's overall appeal, that the federal government has concurrent criminal jurisdiction over the Oxford Lake parcel of the Manistee National Forest, and therefore, the district court had subject matter jurisdiction over the prosecution.[5]

---

[5] Before proceeding to the analysis, it is perhaps worth pausing to note that "jurisdiction" — "a word of many, too many, meanings," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quotation marks and citation omitted) — has at least three meanings, as used in this opinion:  (1) Congress's legislative jurisdiction; (2) the federal prosecutor's adjudicative or prosecutorial jurisdiction, and (3) the federal court's subject matter jurisdiction.  Only the first of these three — legislative jurisdiction, which "refers to the authority of a [sovereign] to make its law applicable

## II.

There are two provisions in the United States Constitution under which Congress may create jurisdiction for the federal government to prosecute federal crimes on federal property:  the Property Clause, Art. IV, § 3, cl. 2, and the Federal Enclave Clause, Art. I, § 8, cl. 17.[6]  The Supreme Court discussed these two provisions, and their interplay, in *Kleppe v. New Mexico*, 426 U.S. 529 (1976).

The Property Clause states:  "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., Art. IV, § 3, cl. 2.  The Supreme Court has given this Clause an "expansive" reading and stated, unequivocally, that the federal government "doubtless has a power over its own property analogous to the police power of the several States."  *Kleppe*, 426 U.S. at 539-40.  "[W]hile the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, [the Supreme Court has] repeatedly observed that the power over the public land thus entrusted to Congress is without limitations."  *Id.* at 539 (quotation marks and edits omitted).  "In short, Congress exercises the powers both of a proprietor and of a legislature over the public domain."  *Id.* at 540.

Indeed, *Kleppe* certainly appears to support — if not stand for — the broad proposition that the federal government's rights in federally owned property are *never* merely those of an ordinary proprietor, despite the "dicta in two cases to the effect that, unless the State has agreed to the exercise of federal jurisdiction, Congress' rights in its land are 'only the rights of an ordinary proprietor.'"  *See Kleppe*, 426 U.S. at 538-39 (quoting *Ft. Leavenworth R.R. v. Lowe*, 114 U.S. 525, 527 (1885), and citing *Paul v. United States*, 371 U.S. 245, 264 (1963)).  That is, even if the federal government expressly declined a State's cession of jurisdiction at the time of acquisition, the federal government would still — under the Property Clause — hold authority beyond that of an ordinary proprietor.  In a piece of analysis particularly pertinent to the present case, the *Kleppe* Court referred to *Hunt v. United States*, 278 U.S. 96 (1928), in which the Court held that Arizona State officials could not prevent federal officials from killing deer in the Kaibab National Forest:

> Indeed, *Hunt* . . . [is] inconsistent with the notion that the United States has only the rights of an ordinary proprietor with respect to its [national forest] land.  An ordinary

---

to persons or activities," *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813 (1993) (Scalia, J., dissenting) (quotation marks and citation omitted) — is actually at issue or determinative of this case.

It is undisputed (and indisputable) that Congress exercised legislative jurisdiction by enacting 18 U.S.C. § 1111, which makes the commission of murder, within the "special maritime and territorial jurisdiction of the United States," a federally punishable offense.  "Jurisdiction," as used in the phrase "special maritime and territorial jurisdiction," § 1111, is certainly a form of subject-matter jurisdiction.  And, United States attorneys are authorized to prosecute, 28 U.S.C. § 547(1), and the federal courts authorized to adjudicate, 18 U.S.C. § 3231, violations of federal statute, such as § 1111.  But, "jurisdiction," as used in the definition of "special maritime and territorial jurisdiction" — i.e., "lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof," 18 U.S.C. § 7(3) — certainly is *not* subject-matter jurisdiction.  "Jurisdiction," as used in the definition of "special maritime and territorial jurisdiction" in § 7(3) is clearly "legislative jurisdiction," in the sense that the lands in question are under "the authority of [the federal government] to make its law applicable to persons or activities [therein]."  *See Hartford Fire Ins. Co.*, 509 U.S. at 813 (Scalia, J., dissenting).  The only question, then, is whether Congress had legislative jurisdiction over the Oxford Lake parcel of the Manistee National Forest, so that § 1111 applies to these circumstances, and thus triggers the prosecutor's adjudicative jurisdiction and the federal court's subject matter jurisdiction.

[6]  Although at least one court, a federal district court, has held that the Commerce Clause empowers Congress in this regard, *see United States v. Griffin*, 58 F.2d 674, 675 (W.D. Va. 1932), this proposition is immaterial to this appeal.  It is perhaps worth noting, however, that the mere existence of three separate provisions necessitates that each provision has some limitation, in order that they coexist.  Otherwise, the most vital of them would render the others essentially lifeless.  For this reason, I find it prudent to resolve this issue under the most apposite provision — and confine this analysis as much as possible to that provision — without treading needlessly on the other provisions.

proprietor may not, contrary to state law, kill game that is damaging his land, as the [Federal] Government did in *Hunt*[.]

*Kleppe*, 426 U.S. at 539 n.9; *see also id.* at 538 (explaining that the Court, in *Hunt*, had "upheld the [Federal] Government's right to kill deer that were damaging foliage in the national forests").

The Federal Enclave Clause provides Congress with the power: "To exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings[.]" U.S. Const., Art. I, § 8, cl. 17. "The Clause has been broadly construed, and the acquisition by consent or cession of exclusive or partial jurisdiction over properties for any legitimate governmental purpose beyond those itemized is permissible." *Kleppe*, 426 U.S. at 542 n.11 (citing *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 528-30 (1938)).

The Court, in *Kleppe*, labeled the powers available under the Federal Enclave Clause "*derivative* legislative powers," *id.* at 541 (emphasis added), and explained:

Congress may acquire derivative legislative power from a State pursuant to Art. I, § 8, cl. 17, of the Constitution [a.k.a., the Federal Enclave Clause] by consensual acquisition of land, or by non-consensual acquisition followed by the State's subsequent cession of legislative authority over the land. In either case, the legislative jurisdiction acquired may range from exclusive federal jurisdiction with no residual state police power, to concurrent, or partial, federal legislative jurisdiction, which may allow the State to exercise certain authority.

*Id.* at 542 (citing *Paul v. United States*, 371 U.S. 245, 264-65 (1963); *Collins*, 304 U.S. at 528-30; *James v. Dravo Contr. Co.*, 302 U.S. 134, 147-49 (1937); *Ft. Leavenworth R.R.*, 114 U.S. at 541-42). In reconciling the two Clauses, the Court explained:

Congress can acquire[, by way of the Federal Enclave Clause,] exclusive or partial jurisdiction over lands within a State by the State's consent or cession[; but,] the presence or absence of such [Federal-Enclave-Clause-based] jurisdiction has nothing to do with Congress' powers under the Property Clause. [Unless there is] consent or cession[,] a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause.

*Id.* at 542-43 (citations omitted) (clarifying the State of New Mexico's "confus[ion of] Congress' derivative legislative powers [under the Federal Enclave Clause], which [we]re not involved in [*Kleppe*], with [Congress'] powers under the Property Clause[, which were]").

Thus, regardless of any possible questions regarding the "furthest reaches" of the Property Clause, *see id.* at 539, the Federal Enclave Clause certainly provides for the federal government to obtain legislative jurisdiction — "rang[ing] from exclusive federal jurisdiction with no residual state police power, to concurrent, or partial, federal legislative jurisdiction, which may allow the State to exercise certain authority" — over land it has acquired "for any legitimate governmental purpose," and the extent of the jurisdiction obtained depends on the State's consent to federal jurisdiction or cession of its own jurisdiction over that land. *See id.* at 542. "The terms of the cession, to the extent that they may lawfully be prescribed, determine the extent of the Federal jurisdiction." *United States v. Unzeuta*, 281 U.S. 138, 142 (1930) (concerning a federal murder prosecution).

The facts established at Gabrion's trial demonstrate that Rachel Timmerman's body was found in the southern portion of Oxford Lake, which lies on an 80-acre parcel in the Manistee

National Forest.  In 1923, the State of Michigan formally consented to the cession of forest lands to the federal government, provided that the State would retain concurrent criminal jurisdiction over those lands.  *See* M.C.L.S. §§ 3.401 & 3.402 (Aug. 30, 1923).  The parcel in question was deeded to the federal government on July 11, 1939, for reservation as national forest.  Thus, there was acquisition and cession, and the extent of jurisdiction was described at the time of cession.

### III.

As was explained at the outset, we interrupted this appeal to raise the issue of subject matter jurisdiction and — taking a cue from Gabrion's footnote 20 — we directed our inquiry towards the effects of 40 U.S.C. § 255 and *Adams v. United States*, 319 U.S. 312 (1943), as well as other pertinent authority, such as 16 U.S.C. § 480, a jurisdictional statute peculiar to national forests.

### A.

Prior to the enactment of 40 U.S.C. § 255 on February 1, 1940, the federal government's acceptance of jurisdiction over acquired land was "presumed in the absence of any dissent on [the federal government's] part."  *See Ft. Leavenworth R.R.*, 114 U.S. at 528 (justifying the presumption on the basis that the grant of jurisdiction "conferred a benefit" on the federal government).[7]

> As such a transfer [of jurisdiction to the federal government] rests upon a grant by the State, through consent or cession, it follows, in accordance with familiar principles applicable to grants, that the grant may be accepted or declined. Acceptance may be presumed in the absence of evidence of a contrary intent, but we know of no constitutional principle which compels acceptance by the United States of an exclusive jurisdiction contrary to its own conception of its interests.

*Silas Mason Co. v. Tax Comm'n*, 302 U.S. 186, 207 (1937); *see also Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 373 (1964) ("It is the established rule that . . . refusal to accept may be proved by evidence."); *Atkinson v. Tax Comm'n*, 303 U.S. 20, 23 (1938); *Benson v. United States*, 146 U.S. 325, 330 (1892) ("although it did not appear that any application had been made therefor by the United States, yet, as it conferred a benefit, acceptance of the cession was to be presumed").

In the present case, the parcel in question was deeded to the federal government on July 11, 1939, without any expression by the federal government of declination of jurisdiction.  "[I]t follows, in accordance with familiar principles applicable to grants, that . . . [a]cceptance may be presumed in the absence of evidence of a contrary intent," *Silas Mason*, 302 U.S. at 207, because the grant of jurisdiction "conferred a benefit" on the federal government, *Ft. Leavenworth R.R.*, 114 U.S. at 528. Under this pre-1940 presumption-of-acceptance approach, the federal government accepted jurisdiction when it acquired the parcel in 1939 and no further affirmation was necessary.[8]

---

[7] *See Gabrion*, 2006 U.S. Dist. LEXIS 60578 at *23, 2006 WL 2473978 at *8 ("Defendant does not dispute the fact that acceptance of jurisdiction was presumed prior to 1940 in the absence of evidence to the contrary.").

[8] This parcel was sold to the federal government for inclusion in the Manistee National Forest, which had been created on the theory that "it would be in the public interest to give such lands, together with certain intermingled public lands, national-forest status," Presidential Proclamation, 53 Stat. 2492 (Oct. 25, 1938), thus conferring a benefit.

In 1940, Congress acted to reverse the presumption of acceptance, by amending 40 U.S.C. § 255[9] to add a new provision: "Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."[10] *See* 54 Stat. 19 (Feb. 1, 1940); *see also Paul*, 371 U.S. at 264-65 ("Since 1940 Congress has required the United States to assent to the transfer of jurisdiction over the property, however it may be acquired."). The critical phrase, "hereafter to be acquired," establishes, within the context of the statute itself, the existence of the prior, opposite presumption.

The Supreme Court has indicated that § 255 applies to the national forests. *See Adams v. United States*, 319 U.S. 312, 315 n.6 (1943) ("In view of the *general applicability of the 1940 Act* [i.e., the provision added to § 255, *see* fn. 10, *supra*], it is unnecessary to consider the effect of the Weeks Forestry Act, 16 U.S.C. 480, and the [State's] statute dealing with jurisdiction in national forests [i.e., the state's ceding statute], . . . even though the land involved here was originally acquired for forestry purposes." (emphasis added)). Elsewhere, at least one other court, the Eighth Circuit Court of Appeals, has applied § 255 to a jurisdictional claim involving a national forest; specifically, a habeas claim on a capital murder conviction that the State of Missouri lacked criminal jurisdiction over the Mark Twain National Forest. *See Hankins v. Delo*, 977 F.2d 396, 398 (8th Cir. 1992) ("Unless the United States accepts jurisdiction over lands ceded by a state by filing a notice of acceptance with the Governor or in some other manner the state prescribes, it is conclusively presumed that the United States has not accepted jurisdiction. 40 U.S.C. § 255 (1988).").[11]

_____

[9] Section 255 was renumbered as 40 U.S.C. § 3112, effective Aug. 21, 2002, and this particular provision restated as § 3112(c): "Presumption. It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section."

[10] Section 255 was originally codified in 1930, pursuant to 46 Stat. 828, ch. 710 (June 28, 1930) ("An Act To amend section 355 of the Revised Statutes to permit the Attorney General to accept certificates of title in the purchase of land by the United States in certain cases."). In 1940, Congress amended § 255 by deleting a provision that required the State legislature to consent to the purchase, and adding the provision regarding the presumption against acceptance (i.e., the provision at issue in this case) as part of a larger paragraph, which states in its entirety:

> Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted.

Act Feb. 1, 1940, 54 Stat. 19, ch. 18. Congress amended § 255 again in October 1940, but did not alter the above provision. *See* Act Oct. 9, 1940, 54 Stat. 1803, ch. 793. Thus, the pertinent amendment to § 255 was the addition, on February 1, 1940, of the statement: "Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."

[11] *Hankins*, 977 F.2d at 398, is cited here for the proposition that another federal court has applied § 255 to a national forest, but the ultimate decision in *Hankins* is inapposite. In *Hankins*, the petitioner cited the state cession statute, Mo. Rev. Stat. § 12.020 (ceding all jurisdiction but service of process), and argued "that the state court lacked jurisdiction because the United States had exclusive jurisdiction." *Id*. at 397. The court was unpersuaded and held that the State had retained jurisdiction, despite its cession statute, because "[t]he parties do not indicate [that] the United States accepted jurisdiction." *Id*. at 398. Thus, the *Hankins* court invoked § 255 and applied it to the national forest, but — with little explanation or reasoning — declined to find exclusive federal jurisdiction.

More importantly, at least for purposes of the present analysis, the *Hankins* court omitted any consideration of the pre-1940 presumption of acceptance of jurisdiction or any evidence of when the forest was created. As it turns out, this omission is critical because the "Mark Twain National Forest was established by Presidential Proclamation on

Finally, as the district court noted, the Department of Agriculture considered the meaning and effect of the amendment shortly after its enactment. *See* USDA Op. No. 2979 (Dec. 18, 1940) (letter from Mastin G. White, USDA Solicitor, to Edward F. Mynatt, USDA Regional Law Director). After quoting the newly added provision of § 255, the Solicitor began by reciting the question posed: "You state that the Regional Forester has asked to be advised of the procedure which must be followed in order to comply with this provision of the statute." In answer, the Solicitor explained:

> [W]*hereas jurisdiction consented to, or ceded by, a State act was normally presumed to have been accepted*, the amendment [to § 255] now provides that it shall be conclusively presumed that no jurisdiction has been accepted, unless it is affirmatively accepted in the manner provided in the amendment. That being the case, State laws, such as § 2050 of the South Carolina Code (1932), consenting to the acquisition of lands for national forest purposes, as required by Section 7 of the Weeks Act (U.S.C., Title 16, § 517) . . . will not result in the acquisition of jurisdiction by the Federal Government, *unless action is taken to accept such jurisdiction, pursuant to the procedure provided in the amendment*.

USDA Op. 2979 at 9665 (emphasis omitted; new emphasis added). The Solicitor concluded by advising that, "[a] copy of this opinion is being sent to the Chief of the Forest Service, so that he may consider whether there are certain cases in which the Forest Service feels that it is desirable to obtain jurisdiction from the State over lands administered by it." *Id*. at 9667.[12]

Therefore, as a general matter, § 255 and its prior opposite presumption apply to national forest lands. Several things support this conclusion: the reasoning behind the presumption and its common application, the Supreme Court's indication in *Adams*, the Eighth Circuit's application of § 255 in *Hankins*, and the USDA's acknowledgment of § 255's applicability to national forests.[13]

**B.**

The national forest concept is somewhat unique among the family of federally owned properties, but one facet is universal — the parameters of federal ownership depend on congressional enactment. Congress enacted specific legislation to create the national forests, which

---

September 11, 1939." *See* "History of the Mark Twain National Forest," *available at* http://www.fs.fed.us/r9/forests/marktwain/about/history (last visited Feb. 28, 2008). But, the *Hankins* court did not acknowledge or explain that § 255 had not been enacted when the forest was created, so there was no impetus for affirmative acceptance, but rather, a presumption of acceptance. Similarly, the court offered no information as to when the federal government acquired the particular parcel. Consequently, the analysis is incomplete and reliance on *Hankins* must be restricted to the proposition that at least one other federal court has applied § 255 to a national forest (albeit perhaps incorrectly).

[12] *See Gabrion*, No. 1:99-CR-76, 2006 U.S. Dist. LEXIS 60578 at *11 n.4, 2006 WL 2473978 at *4 n.4 ("The Forest Service has also noted that 'there appears to be concurrent jurisdiction legislation on most National Forest System lands in Region 9[,] which includes the Manistee National Forest, except for New York.' (Pl. Ex. 6, U.S.F.S. Eastern Region Law Enforcement Plan at 27)." (edits omitted)).

[13] The dissent contends that 16 U.S.C. § 480 is "a specific national forest *exception* to a more general statutory rule," namely, 40 U.S.C. § 255 (currently 40 U.S.C. § 3112). If that were so, it would mean that the exception pre-dated the rule by almost 43 years: § 480 (the purported exception) was first enacted February 22, 1897, *see* 30 Stat. 36 (reenacted March 1, 1911, *see* 36 Stat. 963), almost 43 years before § 255 (the general rule) was enacted on February 1, 1940, *see* 54 Stat. 19. It is therefore noteworthy that Congress did not include any exceptions to § 255 (e.g., § 480 or any other statute) during the enactment of § 255 in 1940, and has not identified any exceptions in the 67 years since.

included 16 U.S.C. § 480, a jurisdictional statute that appeared to have some bearing on the present case.[14]

## 1.

The federal government — either the President, pursuant to the Creative Act of 1891, 16 U.S.C. § 471, 26 Stat. 1103, § 24 (Mar. 3, 1891) (*repealed* Oct. 21, 1976), or the Secretary of Agriculture, pursuant to the Weeks Act, 16 U.S.C. § 521, 36 Stat. 963, § 11 (Mar. 1, 1911) — has designated certain federally owned lands as "national forests."  In providing for the designation of these national forests, Congress also prescribed the division of state and federal jurisdiction:[15]

> The jurisdiction, both civil and criminal, over persons within national forests shall not be affected or changed by reason of their [i.e., the national forests'] existence, except so far as the punishment of offenses against the United States therein is concerned; the intent and meaning of this provision being that the State wherein any such national forest is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State.

16 U.S.C. § 480 (codifying the Organic Act, 30 Stat. 36, § 1 (June 4, 1897) (captioned "Civil and criminal jurisdiction."); reenacted under the Weeks Act, 36 Stat. 963, § 12 (Mar. 1, 1911) (captioned "State jurisdiction not affected.  Offenses against the United States excepted.")).

There is, of course, nothing remarkable about the prospect that our separate systems of government, state and federal, would each retain jurisdiction to enforce its respective criminal laws in lands over which both are sovereign.  In fact, when considered in its proper context, a provision for concurrent jurisdiction is perfectly understandable, mainly because national forests, unlike other federally owned lands, may have people actually residing within their boundaries.  The Forest Reserve provisions of the Organic Act, 30 Stat. 11, 34-36 (June 4, 1897), were drafted with this in mind, and included statements that addressed many aspects of this habitation, such as rights to ingress and egress, prospecting, land claims, maintenance of schools and churches, water use, and — most pertinent here — civil and criminal jurisdiction.  Perhaps more to the point, the provision for civil and criminal jurisdiction, which eventually became 16 U.S.C. § 480, was drafted in light of the prevailing sentiment of the time: that a traditional federal enclave was effectively "a state within a state," *see Howard v. Comm'rs of Sinking Fund*, 344 U.S. 624, 627 (1953), and its inhabitants were thus excepted from the benefits of state citizenship, such as the right to file for marriage or divorce, receive state education, vote or hold office, or "receive any [other] benefits

---

[14] The possibility exists that 16 U.S.C. § 480 might not actually apply, based on the facts and circumstances of this case.  A plain reading of § 480 reveals that the broad interpretation used in this opinion might be overly favorable to Gabrion's position.  Section 480 begins: "The jurisdiction, both civil and criminal, over persons within national forests shall not be affected or changed by reason of their existence . . ." — "*their* existence" meaning the existence of the newly created national forests.  But, in this case, the mere "existence" or designation of the national forest did not change any jurisdiction.  The change in jurisdiction — to the extent that there actually was a "change" in jurisdiction as it is described in this statute — was effectuated by the transfer of title coupled with the State's ceding of jurisdiction.

Furthermore, the phrase "persons within the national forest," as originally enacted, meant "inhabitants" of the national forest, not merely persons who entered a national forest to commit a murder or dispose of a victim.  *See* discussion in text, *infra*.  Marvin Gabrion did not live in the Manistee National Forest.  Finally, the State of Michigan did not "lose" any jurisdiction due to "cession."  Therefore, on a strict reading, § 480 may not even apply in this case.

[15] Although not included expressly, this provision covers tribal jurisdiction as well.  *See Ute Indian Tribe v. Utah*, 773 F.2d 1087, 1090 (10th Cir. 1985) (en banc) (relying on 16 U.S.C. § 480 to conclude that "Indian jurisdiction does extend to Indians on forest lands"), *abrogated on other grounds by Hagen v. Utah*, 510 U.S. 399 (1994).

derived from state residency." *See* Maj. Stephen E. Castlen & Lt. Col. Gregory O. Block, *Exclusive Federal Legislative Jurisdiction:  Get Rid of It!*, 154 Mil. L. Rev. 113, 122 (1997).

In this light, § 480 evinces a focus on the *inhabitants* of the national forest, rather than the forests themselves, and when read in its entirety, § 480 reveals a purpose beyond the mere division of labor between the state and federal systems.  The section has two distinct clauses:

> The jurisdiction, both civil and criminal, over persons within national forests shall not be affected or changed by reason of their existence, except so far as the punishment of offenses against the United States therein is concerned;

and

> [T]he intent and meaning of this provision being that the State wherein any such national forest is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens [of the State], or be absolved from their duties as citizens of the State.

The first clause merely provides — in broad terms — that no State will lose its jurisdiction over national forest lands merely by virtue of the designation of those lands as national forests, and, concomitantly, inhabitants of lands that have been thus designated will continue to have the rights, privileges, and duties of citizens of the State in which the national forest lands are located.  The second clause simply clarifies and reinforces this reading of the first clause.

An argument could be made that § 480 categorically rejects any federal jurisdiction over the national forests — by reading the first clause as saying that *federal* jurisdiction shall not be affected or changed (i.e., by adding the word "federal" to the first clause), and construing this to mean that the preexisting *absence* of federal jurisdiction shall not be affected or changed.[16]  But, such an interpretation is simply not plausible because of the second clause, which expressly clarifies that: "the intent and meaning of this provision being that the *State . . . shall not . . . lose* its jurisdiction" (emphasis added).  In short, § 480 provides that the designation of land by the United States as a national forest does not — without something more — deprive the inhabitants of that land of their rights as state citizens, but neither does this protection prevent the United States from exercising jurisdiction over congressionally enacted federal crimes committed on that land.

This statute first appeared in the Organic Act of 1897, which was "Congress' answer to the[] continuing problems" with the then six-year-old national-forest concept, not the least of which was the "rampant" and "indiscriminate" reservation of millions of acres of "generally settled" forest land, and the apprehension that such reservation "might prove disastrous to the settlers living on or near these lands." *United States v. New Mexico*, 438 U.S. 696, 705-06 (1978) (quotation marks, citations, and footnotes omitted) (recounting the origins of the national forest legislation).[17]  Recall that the

---

[16] Of course, for even this stand-alone interpretation of this first clause to be both plausible *and sensible*, the exception at the end of the clause ("except so far as the punishment of offenses against the United States therein is concerned") must mean something other than what it plainly says — i.e., it would be nonsensical to say that § 480 categorically rejects any federal criminal jurisdiction except for jurisdiction over federal crimes.  Consequently, the dissent construes the phrase "offenses against the United States" as meaning only certain federal crimes of nationwide application.  But, as discussed in the text, *infra*, that construction is insupportable and incorrect.

[17] The Supreme Court documented this history in *United States v. New Mexico*, 438 U.S. 696 (1978), explaining:

> In the mid and late 1800's, many of the forests on the public domain were ravaged and the fear arose that the forest lands might soon disappear, leaving the United States with a shortage both of timber and of watersheds with which to encourage stream flows while preventing floods.  It was

sentiment of the time was that a "federal enclave" was considered a "state within a state," so the birth of this new national-forest-type federal enclave — coupled with the "rampant" and "indiscriminate" reservation of lands as national forests, if national forests were to be considered traditional federal enclaves — presaged an expectation that this national-forest concept might incidentally remove a substantial amount of territory (and the inhabitants therein) from the governance of the States, and correspondingly deny those inhabitants the associated benefits and burdens of State citizenship.

In this context, § 480's first clause clearly addresses these implications — i.e., the birth of this new type of vast federal enclave within the territorial boundaries of the State — and ensures that the mere change in ownership (from privately-owned or State-owned to federally-owned) and designation (as the "national forest" variety of federal enclave) does not result in *exclusive* federal jurisdiction over these lands. Specifically, the federal government could prosecute federal offenses committed on these newly owned, newly designated, newly established national forest lands, *see infra*, but nothing else changed; the inhabitants were not excepted from the benefits or burdens of State citizenship and the State was not prevented from exercising its own jurisdiction, just as it would have done prior to the transition. The second clause simply clarifies this view.

**2.**

The second important aspect of § 480 is the exception for "offenses against the United States." "It has long been established that the words 'offense against the United States' encompass all offenses against the laws of the United States, not just offenses directed at the United States as target or victim." *United States v. Gibson*, 881 F.2d 318, 321 (6th Cir. 1989) (citing *Radin v. United States*, 189 F. 568, 571-72 (2d Cir. 1911); *Thomas v. United States*, 156 F. 897, 900-01 (8th Cir. 1907)); *accord Cotton v. United States*, 52 U.S. 229, 231 (1850) (explaining that offenses against the United States are those which are defined by congressional statute); *United States v. Gill*, 204 F.2d 740, 742 (7th Cir. 1953) (reasoning that Congress, when enacting Title 18, meant "crimes against the United States" to mean "offenses which Congress had defined and for which Congress had fixed a penalty"); *cf.* 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."); 28 U.S.C. § 547(1) ("each United States attorney, within his district, shall - - prosecute for all offenses against the United States"); U.S. Const., Art. II, § 2, cl. 1 (the President has the "Power to grant Reprieves and Pardons for Offenses against the United States").

---

in answer to these fears that in 1891 Congress authorized the President to 'set apart and reserve, . . . any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations.' Creative Act of Mar. 3, 1891, § 24, 26 Stat. 1103, as amended, 16 U.S.C. § 471 (repealed 1976).

The Creative Act of 1891 unfortunately did not solve the forest problems of the expanding Nation. To the dismay of the conservationists, the new national forests were not adequately attended and regulated; fires and indiscriminate timber cutting continued their toll. To the anguish of Western settlers, reservations were frequently made indiscriminately. President Cleveland, in particular, responded to pleas of conservationists for greater protective measures by reserving some 21 million acres of 'generally settled' forest land on February 22, 1897. President Cleveland's action drew immediate and strong protest from Western Congressmen who felt that the 'hasty and ill considered' reservation might prove disastrous to the settlers living on or near these lands.

Congress' answer to these continuing problems was three-fold. It suspended the President's Executive Order of February 22, 1897; it carefully defined the purposes for which national forests could in the future be reserved; and it provided a charter for forest management and economic uses within the forests. Organic Administration Act of June 4, 1897, 30 Stat. 34, 16 U.S.C. § 473 et seq.

*Id.* at 705-06 (footnotes omitted); *see also id.* at 706 n. 13 ("A major complaint of the Western Congressmen was that rampant reserving of forest lands by the United States might leave 'no opportunity there for further enlargement of civilization by the establishment of agriculture or mining.' 30 Cong. Rec. 1281 (1897) (Sen. Cannon).").

By virtue of its own express exception, § 480 does not bar the federal government from obtaining jurisdiction over the prosecution of offenses against the United States. The violation of a federal statute in this case, namely 18 U.S.C. § 1111, is an offense against the United States. Therefore, even if this prosecution "affected or changed" the jurisdictional status quo, such effect or change is expressly allowed by the statute. Section 480 simply cannot be read as preventing the federal government from prosecuting federal offenses committed in the national forest.

**3.**

Finally, 16 U.S.C. § 480 is commonly understood as allowing concurrent jurisdiction over the national forests. *United States v. Fields*, -- F.3d --, No. 05-7128, slip op. at 15, 2008 U.S. App. LEXIS 4018 at *19-20, 2008 WL 483281 at *6 (10th Cir. Feb. 25, 2008); *see also*, *e.g.*, *United States v. California*, 655 F.2d 914, 919 (9th Cir. 1980) (citing § 480 for the proposition that "Congress has determined that the states shall maintain concurrent criminal and civil jurisdiction over national forests"); *United States v. Raffield*, 82 F.3d 611, 613 (4th Cir. 1996) (holding that § 480 "does not in any way preclude state and federal governments from entering into a relationship of concurrent jurisdiction"); *cf United States v. Avants*, 367 F.3d 433, 440 (5th Cir. 2004) (upholding federal jurisdiction and affirming a federal conviction for a murder committed in the Homochitto National Forest, despite the defendant's acquittal in state court, albeit without reference to or consideration of § 480); *United States v. Jackson*, 327 F.3d 273, 281 (4th Cir. 2003) (upholding federal jurisdiction and conviction for a murder committed in the Pisgah National Forest, despite the defendant's conviction for the same crime in state court, albeit without reference to § 480).

"By this enactment Congress in effect has declined to accept *exclusive* legislative jurisdiction over forest reserve lands, and expressly provided that the state shall not lose its jurisdiction in this respect nor the inhabitants 'be absolved from their duties as citizens of the State.'" *Wilson v. Cook*, 327 U.S. 474, 487 (1946) (emphasis added). The Court did not say that Congress declined to accept *any* jurisdiction, nor did it say that Congress declined to accept *any change* in jurisdiction. The Court simply said that Congress did not want federal jurisdiction to be *exclusive*. *See also United States v. County of Fresno*, 429 U.S. 452, 455 (1977) (noting that "[p]ursuant to 16 U.S.C. § 480, the States retain civil and criminal jurisdiction over the national forests notwithstanding the fact that the national forests are owned by the Federal Government"). Concurrent jurisdiction is fine.

Indeed, a majority of this court has at least tacitly endorsed the idea that § 480 provides for concurrent jurisdiction. *See Stupak-Thrall v. United States*, 70 F.3d 881, 888 (6th Cir. 1995), *vacated on grant of reh'g en banc*, 81 F.3d 651 (6th Cir. 1996) (Moore, J., writing, joined by Nelson and Brown, JJ.) ("Section 480 merely provides that both the state and the United States shall have general concurrent jurisdiction over individual citizens in forest areas."); *Stupak-Thrall v. United States*, 89 F.3d 1269, 1271 (6th Cir. 1996) (aff'g without opinion by an equally divided en banc court) (Moore, J., concurring, joined by Merritt, C.J., and Daughtrey, J.) ("I would adhere to the panel opinion in its entirety, and I incorporate it herein by reference."); *id.* at 1284 n.18 (Boggs, J., dissenting, joined by Norris, Suhrheinrich, and Batchelder, JJ.) (acknowledging, and agreeing with, the concurrence's opinion that "§ 480 does provide for concurrent federal-state jurisdiction").

**C.**

Congress has established a specific procedure by which the Secretary of Agriculture can relinquish federal jurisdiction over national forest lands: by either (1) filing a notice of relinquishment with the Governor of the State, to take effect upon acceptance, or (2) taking such action towards relinquishment "as the laws of the State may otherwise provide." *See* 7 U.S.C.

§ 2268. There is no evidence of such relinquishment in the present case. The letters and reports entered into the record fall well short of this procedure, and are therefore insufficient.[18]

## IV.

In 1923, the State of Michigan formally consented to the cession of its forest lands to the federal government, expressly reserving *concurrent* criminal jurisdiction over those lands. *See* M.C.L.S. §§ 3.401-02. An 80-acre parcel containing the southern portion of Oxford Lake was deeded to the federal government on July 11, 1939, and is currently part of the Manistee National Forest. There was federal acquisition and state consent, and the extent of jurisdiction was described at the time of consent. Because this transfer occurred prior to 1940, acceptance of jurisdiction was presumed. Congress has not acted to retrocede jurisdiction back to the State of Michigan.

Rachel Timmerman was found murdered on this parcel of the Manistee National Forest on July 5, 1997, and the federal government indicted, prosecuted, and convicted Marvin Gabrion for this crime. The federal government had concurrent legislative jurisdiction over the Manistee National Forest in accordance with Art. I, § 8, cl. 17, and hence, territorial jurisdiction over the prosecution of this crime, in accordance with 18 U.S.C. § 7(3). To the extent that the federal government's acquisition of this land, coupled with Michigan's cession of concurrent jurisdiction, somehow "affected or changed" the jurisdictional status of the Manistee National Forest, the federal government prosecuted Gabrion for an "offense against the United States," and was thus nonetheless in compliance with 16 U.S.C. § 480. The grand jury charged Gabrion with murder under federal statute, 18 U.S.C. § 1111, committed within federal territorial jurisdiction, § 7(3). After the petit jury convicted him on that charge, the court sentenced him to death pursuant to federal statute, § 3594. Both the federal prosecutor and the federal district court had jurisdiction.

## V.

Based on the foregoing, the district court was correct in both its analysis and its conclusion on the issue of federal jurisdiction. Therefore, we **AFFIRM** the district court's finding that it had subject matter jurisdiction over Gabrion's trial, and correspondingly, authority to enter an order of conviction and impose punishment. Consequently, we will set a date to hear argument on the merits of Gabrion's appeal and his 25 remaining claims of error.

---

[18] The dissent cites five administrative-agency or executive-branch opinions, all of which demonstrate a preference against federal jurisdiction on national forest lands, but all of which also concede that *some* national forest areas nonetheless exist under either exclusive or concurrent federal jurisdiction. The dissent fails to explain the existence of these areas or reconcile their existence with its theory that "§ 480 negates and prohibits the exercise of either exclusive or concurrent federal jurisdiction." Under the dissent's theory, these areas could not legally exist.

---

**CONCURRING IN THE JUDGMENT**

---

KAREN NELSON MOORE, Circuit Judge, concurring in the judgment. I concur in the judgment of the lead opinion and write separately because my analysis differs in some respects and because I believe we are obligated to respond to additional arguments made by Gabrion that the lead opinion does not address. The questions whether the federal government has jurisdiction to prosecute Marvin Gabrion ("Gabrion") and whether the U.S. District Court for the Western District of Michigan has jurisdiction over the trial are exceedingly complex ones. I believe that, although this case involves particularly thorny issues of Constitutional and statutory interpretation, a careful review of precedent yields the clear conclusion that 16 U.S.C. § 480 does not preclude Congress from accepting concurrent legislative jurisdiction over the national forests. Where such concurrent legislative jurisdiction exists, the federal courts have subject-matter jurisdiction over federal prosecutions pursuant to 18 U.S.C. § 1111 for murders that take place in these forests. My reasoning accords with a recent Tenth Circuit opinion upholding federal criminal jurisdiction over the prosecution of a defendant under § 1111 for committing first-degree murder in the Ouachita National Forest in Oklahoma.[1] *United States v. Fields*, --- F.3d ---, No. 05-7128, 2008 WL 483281, at \*2-\*9 (10th Cir. Feb. 25, 2008).

## I. DOES 16 U.S.C. § 480 ALLOW THE FEDERAL GOVERNMENT TO EXERCISE CONCURRENT JURISDICTION OVER NATIONAL FOREST LANDS?

This case requires us to delineate the extent of Congress's Constitutional powers under the Property, Federal Enclave, and Interstate Commerce Clauses as well as Congress's intent in enacting § 480. I have reached the conclusion that under these three clauses of the Constitution Congress has broad authority to legislate with respect to the national forests. The provision of the Weeks Act specifically addressing jurisdiction over the national forests, § 480, provides for the exercise of concurrent federal and state legislative jurisdiction over national forests, where the federal government accepts such jurisdiction. Because § 480 allows for concurrent legislative jurisdiction by the federal government, it also allows for the exercise of subject-matter jurisdiction by the federal courts when Congress creates a cause of action. Congress has created a cause of action via 18 U.S.C. § 1111, which allows for federal prosecution of murder in the special territorial and maritime jurisdiction of the United States, and via 18 U.S.C. § 7, which defines that jurisdiction. In turn, 18 U.S.C. § 3231 vests original jurisdiction in the federal district courts "of all offenses against the laws of the United States," including violations of § 1111.

### A. Constitutional Authority to Exercise Legislative Jurisdiction

Congress derives legislative authority to criminalize acts perpetrated in national forests from the Federal Enclave Clause, Art. I, § 8, cl. 17; the Property Clause, Art. IV, § 3, cl. 2; and the Interstate Commerce Clause, Art. I, § 8, cl. 3. Both the dissent and lead opinion reference only the

---

[1] I also find it relevant to note that two other circuits have upheld convictions involving murder in national forests. The Fifth Circuit in *United States v. Avants*, 367 F.3d 433 (5th Cir. 2004), upheld the conviction of Ernest Henry Avants under 18 U.S.C. §§ 1111 and 7(3), for a 1966 racially motivated murder in a national forest located in Mississippi. The Fourth Circuit in *United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003), upheld the conviction of Richard Allen Jackson for use of a firearm in relation to the kidnapping, sexual abuse, and murder of a victim in a national forest in North Carolina, in violation of 18 U.S.C. § 924(j). Although each of these circuits implicitly found that the district courts had subject-matter jurisdiction over the criminal prosecutions, neither discussed the issue of jurisdiction in their opinions. For this reason, they do not aid our analysis, but the decisions are nevertheless relevant to the question of whether the Western District of Michigan had jurisdiction in this case.

Property and Federal Enclave Clauses.  At least one district court, however, has upheld § 480 as a valid exercise of Congressional authority under the Interstate Commerce Clause.  *United States v. Griffin*, 58 F.2d 674, 675 (W.D.Va. 1932) (holding that the Weeks Act is a valid exercise of Congress's authority to regulate interstate commerce because its purpose is to increase the navigability of streams by protecting their watersheds).  Just as the creation of the national forests represented an exercise of Congress's powers under the Interstate Commerce Clause, so too would administering and protecting that land and its inhabitants via criminal law.  In addition, the Federal Enclave Clause gives Congress legislative jurisdiction over lands ceded to it.  In *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 528 (1938), the Supreme Court held that "[t]he States of the Union and the National Government may make mutually satisfactory arrangements as to jurisdiction of territory within their borders . . . ."  The Court held that in two important respects the Federal Enclave Clause should not be construed narrowly.  First, the federal government may acquire qualified as well as exclusive jurisdiction over land and, second, the government may do so for purposes beyond those specified in the language of the Enclave Clause.[2]  *Id.* at 528-29.  Under *Wilson v. Cook*, 327 U.S. 474, 486 (1946), to determine the extent of federal jurisdiction over a territory, we must look at the state statute authorizing the sale as well as the federal statute authorizing acquisition.  In this case, § 480 authorizes federal acquisition, and Mich. Comp. Laws §§ 3.401-3.402 constitute the state provisions authorizing the cession of state lands.

The Supreme Court, however, has also held that regardless of the degree of jurisdiction ceded by a state, the Property Clause gives Congress the power to enact legislation over federal land.  *Kleppe v. New Mexico*, 426 U.S. 529, 542-43 (1976).  I think that this statement in *Kleppe*, as well as the cases interpreting the Enclave Clause, yield the following interpretation.  State cession statutes determine the amount of jurisdiction that the state retains.  Irrespective of this agreement, however, Congress has a broad power to enact legislation related to federal land.  The Supreme Court in *Kleppe* determined that "Congress exercises the powers both of a proprietor and of a legislature over the public domain."  *Id.* at 540.  The Court rejected the "traditional" view "that the United States' powers on most of the public lands are the limited powers of a proprietor, or property owner, not a sovereign."  Charles F. Wilkinson, *The Field of Public Land Law:  Some Connecting Threads and Future Directions*, 1 PUB. LAND L. REV. 1, 7 (1980).  "*Kleppe* thus complete[d] the long evolution from the traditional model, which would relegate all exercises of police power to [Federal Enclave] Clause lands only, to a broad federal preemptive authority under the Property Clause."  *Id.* at 11.  I therefore disagree with the lead opinion that this case presents a significantly clearer case of Congressional authority under the Federal Enclave Clause than under the Property Clause.  The only question regarding Congressional authority under the Property Clause, then, is whether §§ 1111 and 7(3) constitute a "needful" rule "respecting" federal public land including the national forests.  Art. IV, § 3, cl. 2.  *Kleppe* stands for the proposition that Congress has broad authority under the Property Clause to enact criminal legislation regarding national forests, even if that legislation protects not only the lands but also the people within them.[3]

---

[2] "The Enclave Clause power is broader than its wording indicates in two ways.  First, Congress may exercise it over more than just purchased property. . . .  Second, the catch-all 'needful Buildings' in the Clause's list of places subject to the power has been interpreted to include more than edifices with four walls. . . . [I]t may apply to lands used for a National Park."  Marla E. Mansfield, *A Primer of Public Land Law*, 68 WASH. L. REV. 801, 804 (1993).

[3] The Supreme Court in *Kleppe* upheld the constitutionality of the Wild Free-Roaming Horses and Burros Act, which authorized both the Secretary of the Interior through the Bureau of Land Management and the Secretary of Agriculture through the National Forest Service to protect the animals.  426 U.S. at 531.  The Court thus implicitly found that Congress had legislative jurisdiction, at least with respect to civil matters, over public lands including the national forests.  The Court rejected the plaintiffs-appellees' narrow construction of the Property Clause as authorizing Congress to legislate only in protection of the land itself. Instead, the Court held that the Property Clause is broad enough to "to support legislation protecting wild animals that live on federal property . . . [and] which are not themselves federal property."  *Id.* at 536-37.

## B. Legislative Jurisdiction Under 16 U.S.C. § 480

Of course, even if Congress has Constitutional authority to exercise legislative jurisdiction, it may limit its own jurisdiction and that of the courts via specific statutes. Therefore, having determined that three clauses of the Constitution give Congress legislative jurisdiction regarding public lands, I next turn to the question of whether Congress has chosen to exercise that authority via § 480. Precedent strongly suggests that § 480 provides for concurrent federal and state legislative jurisdiction over national forests. The Supreme Court has held that by enacting § 480 "Congress in effect has declined to accept exclusive legislative jurisdiction over forest reserve lands, and expressly provided that the state shall not lose its jurisdiction in this respect . . . ." *Wilson*, 327 U.S. at 487. The Court reiterated this axiom in 1977: "[T]he States retain civil and criminal jurisdiction over the national forests notwithstanding the fact that the national forests are owned by the Federal Government." *United States v. County of Fresno*, 429 U.S. 452, 455 (1977). These statements are best interpreted not as a suggestion that the states retain exclusive legislative jurisdiction under § 480, but rather that the states retain concurrent jurisdiction with Congress.[4]

The Fourth and Ninth Circuits have upheld concurrent federal legislative jurisdiction over the national forests as well as federal courts' subject-matter jurisdiction over civil and criminal matters relating to the national forests. In *United States v. California*, 655 F.2d 914, 916 (9th Cir. 1980), the Ninth Circuit considered an action by the United States to recover fire-suppression costs related to a fire negligently started by state employees in a national forest. The Ninth Circuit found that a federal district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1345, which vests the federal district courts with original jurisdiction of suits brought by the federal government. *Id.* at 916. The Ninth Circuit proceeded to apply state law in the absence of federal law on the subject of a tort recovery for fire suppression costs. *Id.* at 916-20. In the course of its opinion, the Ninth Circuit stated that 16 U.S.C. § 480 provides for concurrent state and federal legislative jurisdiction over national forests. *Id.* at 919. Thus, the Ninth Circuit determined in *California* that the federal government had concurrent jurisdiction over national forests pursuant to 16 U.S.C. § 480 and that the district possessed subject-matter jurisdiction pursuant to 28 U.S.C. § 1345. In the instant case, the federal government once again possesses concurrent jurisdiction over Manistee National Forest and the district court possessed subject-matter jurisdiction pursuant to 18 U.S.C. §§ 1111(b), 7(3), and 3231.[5]

In the 1996 case of *United States v. Raffield*, 82 F.3d 611 (4th Cir.), *cert. denied*, 519 U.S. 933 (1996), the Fourth Circuit held that the federal and state governments had concurrent legislative jurisdiction over the national forests. The Fourth Circuit explained that 16 U.S.C. § 480 "means only that the mere establishment of the forest does not alter the jurisdictional status of the land," and that § 480 "does not in any way preclude state and federal governments from entering into a relationship of concurrent jurisdiction." *Id.* at 613. The Fourth Circuit further explained that a North Carolina state cession statute, similar to Mich. Comp. Laws § 3.401, indicated state consent to concurrent jurisdiction and that 16 U.S.C. § 551 indicated federal acceptance of jurisdiction over

---

[4] The language in the opinions suggests that the default assumption is that the federal government has exclusive legislative jurisdiction over public lands, but that § 480 provides for the states' retention of concurrent jurisdiction over national forests. Furthermore, were § 480 to provide for exclusive legislative jurisdiction by the states, one would expect the opinions to state this explicitly.

[5] The dissent's argument that *California* merely holds that jurisdiction over national forests exists when there is a specific federal statute giving courts jurisdiction and that jurisdiction does not exist in the absence of such a statute does not help us resolve this case. Dissent at 37. In both *California* and the instant case, such a statute exists in the form of 28 U.S.C. § 1345 and 18 U.S.C. § 3231, respectively. The only question is whether first-degree murder in a national forest is an offense against the laws of the United States. For reasons I explain in further detail *infra*, I believe that it is.

all national forest lands. *Id.* at 612. Accordingly, a federal district court had subject-matter jurisdiction over a prosecution for Jeromy Raffield's drunk driving and refusal to submit to a breath analysis in violation of the Assimilative Crimes Act, 18 U.S.C. § 13. While the Fourth Circuit held that 16 U.S.C. § 551 indicated Congress's broad acceptance of federal jurisdiction over all national forest lands, we need not rely on similar reasoning here. Section 551 functioned in the opinion only as the indicator of federal acceptance of jurisdiction. As I explain *infra*, acceptance of federal jurisdiction over lands the federal government purchased prior to 1940 is presumed in the absence of evidence of contrary federal intent. Because no such evidence of contrary intent exists with respect to the government's exercise of jurisdiction over the Oxford Lake parcel, we must conclude that the federal government accepted jurisdiction over the parcel. Therefore, with respect to the land at issue in this case, we do not need to rely on any other statute such as § 551 to indicate the federal government's acceptance of jurisdiction.[6]

The decisions in *Raffield* and *California* buttress an interpretation of § 480 as providing that the states retain jurisdiction over persons within national forests "except so far as the punishment of offenses against the United States." 16 U.S.C. § 480. I think the correct interpretation of the "except clause" is that it creates concurrent federal jurisdiction for the punishment of offenses against the laws of the United States, including laws of both general and specific geographic applicability. In *United States v. Gibson*, 881 F.2d 318 (6th Cir. 1989), we stated: "It has long been established that the words 'offense against the United States' encompass all offenses against the laws of the United States, not just offenses directed at the United States as target or victim." *Id.* at 321. Although *Gibson* interpreted the phrase "offense against the United States" as used in the federal fraud statute, 18 U.S.C. § 371, there is no reason to believe that the phrase has a different meaning in the context of 16 U.S.C. § 480. Because *Gibson* is binding precedent, I think that we must hold that "offenses against the United States" means offenses against the *laws* of the United States. Furthermore, there exists no precedent suggesting that we should limit that category, as Gabrion as well as the dissent argue, to only those laws that "are federal regardless of where the crime is committed." Dissent at 34.

Restricting the meaning of "offense against the United States" under § 480 to only federal laws of general geographic applicability would render the key clause "except so far as the punishment of offenses against the United States" meaningless. The federal government always has jurisdiction over offenses of general geographic applicability. The dissent's narrow interpretation of the "except clause" to merely reassert that obvious proposition renders the clause superfluous and insignificant. "'[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879)). Therefore, I think that § 480 gives Congress concurrent legislative jurisdiction regarding federal offenses of specific as well as general geographic applicability.

Indeed, a Seventh Circuit case suggests that the phrase "offenses against the United States" includes federal laws limited geographically in their application to the special maritime and territorial jurisdiction of the United States. In *United States v. Gill*, 204 F.2d 740 (7th Cir. 1953),

---

[6] I disagree with the dissent's argument that *Raffield* relied on the language in § 551 regulating misdemeanor traffic infractions and that, accordingly, the opinion's holding is limited to the federal government's jurisdiction over drunk driving in the national forests. Dissent at 39. The Fourth Circuit did not find that Raffield had violated § 551. Instead, the opinion found that "§ 551 confers broad federal jurisdiction over activities that affect the national forests." *Raffield*, 82 F.3d at 612. The Fourth Circuit found that as a result, national forests lay within the territorial jurisdiction of the United States under 18 U.S.C. § 7(3) and that therefore the Assimilative Crimes Act applied to the forest. Under parallel reasoning, we should hold that the United States has jurisdiction to enforce 18 U.S.C. § 1111 in the national forests. This conclusion is mandated because 16 U.S.C. § 480 allows for concurrent state and federal jurisdiction; there is no evidence contradicting a mandatory presumption in this case that the federal government has accepted jurisdiction over the Oxford Lake parcel; Gabrion violated § 1111; and Oxford Lake falls within the scope of § 7(3).

the Seventh Circuit upheld a conviction under 18 U.S.C. § 113(b) for an assault with intent to commit sodomy that took place on a federally registered vessel journeying across Lake Michigan from Chicago, Illinois to Michigan City, Indiana. The defendant had argued that because Congress had not defined and criminalized sodomy, it could not be a felony under § 113(b). *Id.* at 741-42. The Seventh Circuit, however, rejected this argument and held that because Indiana criminalized sodomy, under the Assimilative Crimes Statute and § 7(3) the assault with intent to commit sodomy was a crime against the United States. *Id.* at 742-43. Thus, *Gill* stands for the proposition that a statute federalizing a state crime in areas of federal jurisdiction (in that case 18 U.S.C. § 13) makes this crime one committed "against the United States." *Id.* at 743.

Title 18 U.S.C. § 1111 is comparable to the Assimilative Crimes Act in that it provides for the federal government's prosecutorial jurisdiction over a crime (murder) ordinarily within the jurisdiction of the states, so long as the crime takes place in an area of federal jurisdiction. My interpretation does not lead to the conclusion that the federal government would have exclusive jurisdiction of state-law causes of action within national forests. The "except clause" of 16 U.S.C. § 480 *creates* concurrent federal jurisdiction where the pre-existing legal regime prior to cession was exclusive state jurisdiction (apart from federal crimes enacted pursuant to the Interstate Commerce Clause); the "except clause" does not create an exception to concurrent federal and state jurisdiction. Therefore, my argument yields the conclusion that if a murder takes place in a national forest where the federal government has accepted concurrent jurisdiction, both the state and federal governments have jurisdiction to prosecute that murder.

The dissent argues that my interpretation would give federal courts jurisdiction over all state crimes federalized in 18 U.S.C. § 13 (the Assimilative Crimes Act) that take place in national forests and that this is an unprecedented expansion of federal jurisdiction. Dissent at 40. While the first part of this claim is true, the latter is not. At least two courts of appeals decisions including one in the Sixth Circuit have found federal jurisdiction for violations of § 13 that took place in national forests. *See, e.g.*, *United States v. Terry*, 86 F.3d 353, 354 (4th Cir. 1996), *cert. denied*, 524 U.S. 940 (1998); *United States v. Couch*, 65 F.3d 542, 543 (6th Cir. 1995).

We next need to consider whether any statutes other than the Weeks Act limit federal legislative jurisdiction over the national forests. Under a traditional interpretation of the Federal Enclave Clause, we must look to the state statute authorizing cession to determine the degree of federal jurisdiction. *Wilson*, 327 U.S. at 486. I do not believe, however, that we may still hold after the Supreme Court's decision in *Kleppe* that a state statute can limit federal legislative jurisdiction over lands that the national government owns. *Kleppe* reiterated "that '[t]he power over the public land thus entrusted to Congress is without limitations." 426 U.S. at 539. *Kleppe* reasoned that the terms of a state cession statute govern the extent of the state's retention of jurisdiction and not the terms of federal legislative jurisdiction. *Id.* at 541-43. Therefore, we could simply hold that Congress has authority pursuant to the Property Clause to enact 18 U.S.C. § 1111, and that 16 U.S.C. § 480 does not preclude the application of § 1111 in national forests.

Even if one believed erroneously that *Kleppe*'s expansive reading of the Property Clause did not replace the older method of determining the extent of federal jurisdiction under the Federal Enclave Clause, however, we must conclude that Congress has criminal jurisdiction over persons within the Manistee National Forest. Michigan consented to the acquisition by the United States of lands "needed for the establishment . . . of national forests in the state: Provided, That the state of Michigan shall retain a concurrent jurisdiction with the United States in and over lands so acquired" with respect to the execution of civil and criminal process. Mich. Comp. Laws § 3.401. Section two of the relevant Michigan code authorized "the United States to pass such laws and to make or provide for the making of such rules and regulations, of both a civil and criminal nature, and provide punishment therefor, as in its judgment may be necessary for the administration, control, and protection of such lands . . . ." Mich. Comp. Laws § 3.402. Thus, Michigan authorized federal

jurisdiction of offenses in violation of laws such as 18 U.S.C. § 1111, which apply in the special territorial and maritime jurisdiction of the United States, when the federal government deems enforcement necessary for the administration and control of the national forest lands.

## C. Subject-Matter Jurisdiction

The dissent correctly identifies the need to clarify the relationship between legislative and subject-matter jurisdiction.  Dissent at 38-39.  Legislative jurisdiction refers to "[t]he sphere of authority of a legislative body to enact laws and to conduct all business incidental to its law-making function."  BLACKS' LAW DICTIONARY 900 (6th ed. 1990).  Subject-matter jurisdiction "refers to [a] court's power to hear and determine cases of the general class or category to which [the] proceedings in question belong."  *Id.* at 1425.

The question of whether Congress has legislative jurisdiction over national forests or whether Congress merely possesses proprietorial ownership over the forests is intimately connected in this case with the question whether the federal courts have criminal jurisdiction over first-degree murder in a national forest.   The dissent incorrectly interprets my opinion as suggesting that the Constitution, in a self-executing manner, directly confers subject-matter jurisdiction in the federal courts over murders in national forests.  Dissent at 38.  My argument instead develops along the following logical chain:   Congress possesses Constitutional authority to exercise legislative jurisdiction; 16 U.S.C. § 480 allows for this exercise; there exists an unrebutted presumption that Congress accepted legislative jurisdiction over the Oxford Lake parcel purchased in July 1939 and that, consequently, the parcel lies within the territorial jurisdiction of the United States; Congress has created a cause of action respecting first-degree murder in the territorial jurisdiction of the United States; and Congress has given the federal district courts jurisdiction over this and other criminal causes of action.

I have made clear why I believe that 16 U.S.C. § 480 provides for concurrent legislative jurisdiction by the federal government over offenses against the United States of both national and limited geographic applicability.  Congress has created a cause of action via 18 U.S.C. § 1111(b), which allows for federal prosecution of murder in the special territorial and maritime jurisdiction of the United States, and via 18 U.S.C. § 7(3), which defines that jurisdiction.  As I explain *infra*, the Oxford Lake parcel at issue lies within the territorial jurisdiction of the United States as defined by § 7(3).  And here is where the relationship between legislative and subject-matter jurisdiction becomes clear.  A violation of § 1111 in a national forest, where that forest falls within the scope of § 7(3), is an offense against the laws of the United States, as I have explained *supra*.  In turn, 18 U.S.C. § 3231 vests original jurisdiction in the federal district courts "of all offenses against the laws of the United States."  I therefore believe that so long as the Oxford Lake parcel lies within the territorial jurisdiction of the United States, pursuant to § 7(3), then the United States District Court for the Western District of Michigan correctly found that it had subject-matter jurisdiction over Gabrion's prosecution.

## II.  IS THE SOUTHERN THIRD OF OXFORD LAKE WHERE GABRION ALLEGEDLY MURDERED TIMMERMAN, WITHIN THE SPECIAL TERRITORIAL AND MARITIME JURISDICTION OF THE UNITED STATES AS DEFINED IN 18 U.S.C. § 7(3)?

In its June 2001 opinion, the district court found that the southern portion of Oxford Lake where Gabrion allegedly murdered Timmerman ("Timmerman") lies within the special territorial jurisdiction of the United States as defined in § 7(3).  J.A. at 201-12 (6/11/01 Dist. Ct. Op.).  Section 7(3) includes within the special territorial jurisdiction of the United States:

> Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

18 U.S.C. § 7(3). The district court's conclusion regarding § 7(3) was not an issue upon remand and was not addressed by the parties in their supplemental briefs before this court, so I will not address it here.

The question before us today is whether the federal government has accepted concurrent legislative jurisdiction over the Oxford Lake parcel. Precedent establishes that, in the absence of evidence of contrary intent, a presumption of acceptance of jurisdiction by the federal government exists with respect to land acquired prior to 1940. The federal government purchased the Oxford Lake parcel in July 1939, and Gabrion has presented no evidence suggesting that the federal government took the requisite affirmative steps to rebut a presumption of acceptance of jurisdiction at that time. United States Department of Agriculture ("USDA") and interdepartmental opinions, written after 1940, are advisory and insufficient to rebut the acceptance of jurisdiction. I therefore conclude that the federal government has accepted jurisdiction over the Oxford Lake parcel.

## A. Acceptance of Jurisdiction by the Federal Government

Gabrion's argument that the federal government never formally accepted jurisdiction over the Oxford Lake parcel pursuant to 40 U.S.C. § 255 is unavailing. Prior to 1940, courts applied a rebuttable presumption of acceptance by the federal government to jurisdiction over public lands that it owned. The Supreme Court held that when a state cession statute "conferred a benefit, the acceptance of the act is to be presumed in the absence of any dissent on [the federal government's] part." *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 528 (1885); *see also Benson v. United States*, 146 U.S. 325, 330 (1892) (same). The Court presumed federal acceptance of jurisdiction "in the absence of evidence of a contrary intent." *Silas Mason Co. v. Tax Comm'n*, 302 U.S. 186, 207 (1937). With the passage of § 255 on February 1, 1940,[7] the federal government had to start giving notice regarding acceptance of jurisdiction over public lands acquired thereafter. *Paul v. United States*, 371 U.S. 245, 264 (1963). The Supreme Court and the Eighth Circuit have applied the notice requirement of § 255 to national forest lands acquired after 1940. *Adams v. United States*, 319 U.S. 312, 315 n.6 (1943) (reasoning that "[i]n view of the general applicability of the 1940 Act it is unnecessary to consider the effect of the Weeks Forestry Act, 16 U.S.C. § 480"); *Hankins v. Delo*, 977 F.2d 396, 398 (8th Cir. 1992) (holding with respect to the Mark Twain National Forest in Missouri that "[t]he parties do not indicate the United States accepted jurisdiction"). The application of the § 255 notice requirement to national forest lands makes it logical to conclude that the prior rebuttable presumption of acceptance of federal jurisdiction also applied to national forests.

## B. Administrative Opinions

For several reasons, post-1940 opinions of the USDA, interdepartmental reports, and the Forest Service Manual, which exhibit a strong preference for maintaining proprietorial rather than concurrent jurisdiction over national forests, are insufficient to rebut a presumption of federal legislative jurisdiction over the Oxford Lake parcel in the Manistee National Forest. To begin, the Department of Justice and not the USDA possesses the authority to determine whether the federal government has criminal jurisdiction over acts committed upon federal land. 28 C.F.R. § 0.56 ("The Assistant Attorney General in charge of the Criminal Division is authorized to determine

---

[7] In 2002, Congress renumbered 40 U.S.C. § 255 as 40 U.S.C. § 3112. Pub. L. No. 107-217, § 1, 116 Stat. 1144 (2002).

administratively whether the federal government has exclusive or concurrent jurisdiction over offenses committed upon lands acquired by the United States, and to consider problems arising therefrom.")

Furthermore, the executive-branch opinions cited by Gabrion would not qualify for *Chevron* deference unless "it appear[ed] that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). The USDA statements cited by the defendant represent merely opinions and commission-report findings rather than official agency interpretations promulgated under the Department's rulemaking authority. "Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Moreover, statements made after the enactment of § 255 cannot rebut the presumption of acceptance regarding property acquired before 1940. Even if we were to accept the statements as potentially relevant, they probably do not represent the type of affirmative action required to rebut the pre-1940 presumption of acceptance. *See Silas Mason*, 302 U.S. at 207-08 (holding that when Congress "validated and ratified 'all contracts'" in connection with a dam project, "the evidence [was] clear that the Federal Government contemplated the continued existence of state jurisdiction"); *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372 (1964) (holding that the federal government did not lose the exclusive jurisdiction it acquired in 1930 over a federal enclave via cession by the state of Louisiana, when United States "leased [to a private company] the right to exploit parts of the reservation for oil and gas and for an oil pipeline").

Finally, the reports themselves are not conclusive regarding the question of jurisdiction. The 1956 Report stated that the terms it uses to describe jurisdiction "are made here only for the purposes of this study, and they are not purported as absolute criteria for interpreting legislation or judicial decisions, or for other purposes." *Jurisdiction Over Federal Areas Within the States: Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States, Part I* 13-14 (1956) (Def. Ex. D). The same report also emphasized that agency preference does not determine the jurisdictional status of lands, and that often lands acquired before 1940 "are held with more jurisdiction in the United States than is considered best by the Federal agency concerned." *Id.* at 35. Although several of the statements express a preference that Congress exercise only proprietorial ownership, they do not deny the legality of concurrent legislative jurisdiction under § 480. *See, e.g.*, Land & Natural Res. Div., U.S. Dep't of Justice, *Fed. Legislative Jurisdiction: Report Prepared for the Public Land L. Rev. Comm.* 75 (September 1969) (Def. Ex. J) (noting that "only seven of the Forest Service's 245 properties contain other than proprietorial jurisdiction"); *Report of the Interdepartmental Committee, Part II* at 114 (Def. Ex. E) (stating that "[t]he forest service . . . has not accepted the jurisdiction proffered by the statutes of many states, and the *vast majority* of federal forest lands are held by the Federal Government in a proprietorial status only") (emphasis added); *Report of the Interdepartmental Committee, Part I* at 64, 101 (Def. Ex. D) (noting that the Department of Agriculture exercises "proprietorial" ownership over *nearly all* of its lands). Nor do the statements deny the existence of federal legislative jurisdiction over lands acquired before 1940. *Id.* These statements merely reflect efforts to resolve the jurisdictional confusion created by the passage of § 255, with respect to lands acquired after the 1940 enactment. Roger W. Haines, Jr., *Crimes Committed on Federal Property—Disorderly Jurisdictional Conduct*, 4 CRIM. JUST. J. 375, 393-95 (1981).

### III.  DOES THE PATCHWORK CHARACTER OF CONCURRENT FEDERAL AND EXCLUSIVE STATE JURISDICTION IN THE MANISTEE NATIONAL FOREST VIOLATE THE CONSTITUTIONAL GUARANTEES OF DUE PROCESS AND EQUAL PROTECTION?

Gabrion argues that the patchwork character of federal criminal jurisdiction in the Manistee National Forest, which depends on the date of acquisition of parcels of land, violates his rights to due process and equal protection under the Fifth Amendment as well as the prohibition on cruel and unusual punishment under the Eighth Amendment.[8]  Gabrion's primary argument is that the federal government's patchwork jurisdiction is inconsistent with the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972), which prohibited arbitrary enforcement of the death penalty.  *Id.* at 249 (Douglas, J., concurring); *id.* at 274 (Brennan, J., concurring); *see also id.* at 310 (Stewart, J., concurring) (stating that the Eighth and Fourteenth Amendments prohibit "wanton[]" and "freakish[]" imposition of the death penalty).  While I agree that the pattern of jurisdiction in the Manistee National Forest created by 16 U.S.C. § 480 and 40 U.S.C. § 255 can be characterized as patchwork, I do not agree that this pattern is arbitrary.  A clear set of legal rules determines which national forest lands are characterized by concurrent federal criminal jurisdiction and which national forest lands are characterized by state jurisdiction because the federal government has not accepted jurisdiction.  In conclusion, I do not think that the patchwork character of federal criminal jurisdiction in the Manistee National Forest means that the government's prosecution of Gabrion for the death penalty pursuant to 18 U.S.C. § 1111 violates the Eighth Amendment.[9]

Neither does the patchwork jurisdiction violate Gabrion's right to equal protection under the Fifth Amendment's Due Process Clause.  *See Bolling v. Sharpe*, 347 U.S. 497 (1954) (holding that the District of Columbia's maintenance of segregated schools violated the Fifth Amendment's Due Process Clause).  The government makes a convincing argument that federal Indian law offers an analogous area where patchwork jurisdiction does not violate the Equal Protection Clause of the Fourteenth Amendment, reversely incorporated into the Fifth Amendment.  The Supreme Court has described jurisdiction in "Indian country" as "governed by a complex patchwork of federal, state, and tribal law." *Duro v. Reina*, 495 U.S. 676, 680 n.1 (1990).  Whether the federal or a tribal or state government has criminal jurisdiction depends on the location where a crime is committed, the nature of the crime, and whether both the perpetrator and the victim are members of the same tribe. *See Negonsott v. Samuels*, 507 U.S. 99, 102-03 (1993) (describing jurisdictional rules under the Indian Country Crimes Act, the Indian Major Crimes Act, and the Kansas Act); *Duro*, 495 U.S. at 688 (holding that a tribe does not have criminal jurisdiction over a nonmember Indian who commits a crime on the tribe's territory).  In *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463 (1979), the Supreme Court considered whether such patchwork jurisdiction is arbitrary and irrational under the Equal Protection Clause.  The case concerned a Washington law that granted jurisdiction to the state over Indian persons and Indian territory within the state, with

---

[8] In Sections III through V of my opinion, I discuss Gabrion's argument regarding the patchwork character of federal jurisdiction in the Manistee National Forest, as well as Gabrion's arguments regarding the sufficiency of the evidence required to establish jurisdiction and the jury instructions respecting jurisdiction.  I have addressed these issues because although they touch on the merits of the case, they are also intertwined with the question of whether the district court had subject-matter jurisdiction over this case.  Were Gabrion to succeed on any one of these arguments, I do not think the district court would have properly exercised jurisdiction.  Furthermore, the parties argued these three issues in briefs filed in February 2007, in response to our request for briefing on the issue of jurisdiction.

[9] The Supreme Court's decision in *Parker v. Dugger*, 498 U.S. 308 (1991), which Gabrion also cites for the proposition that the death penalty cannot be imposed in an arbitrary and irrational manner, is similarly inapposite.  In *Parker*, the Supreme Court overturned the Eleventh Circuit's denial of habeas corpus relief on the ground that the Florida Supreme Court had affirmed the death penalty based on the incorrect determination that the trial court had found no nonstatutory mitigating circumstances. *Id.* at 318-21.  By contrast, the instant case does not involve the question whether an error in judicial process had denied Gabrion the right to rational administration of the death penalty.

the exception that in all but eight subject-matter areas Indians would retain jurisdiction on trust or restricted lands unless a tribe requested otherwise. *Id.* at 465-66. The Washington statue thus created patchwork jurisdiction in both a geographic and thematic sense. The Ninth Circuit found that the law's creation of checkerboard jurisdiction lacked a rational basis and violated the Equal Protection Clause. *Id.* at 467-68. The Supreme Court overturned the court of appeals decision, however, explaining: "The lines the State has drawn may well be difficult to administer. But they are no more or less so than many of the classifications that pervade the law of Indian jurisdiction." *Id.* at 502.

Gabrion further argues that the patchwork character of federal jurisdiction over the Manistee National Forest, resulting from the legal regime established by 16 U.S.C. § 480 and 40 U.S.C. § 255, violates his due process right to *ex ante* notice of the penalty for his crime. The cases cited by the government in response are not dispositive of this issue.[10] I find Gabrion's argument unpersuasive, however, for three reasons. First, because 18 U.S.C. § 1111 was operative at the time that Gabrion allegedly committed the murder, Gabrion had notice of the possibility that he would receive the death penalty for committing premeditated murder within the special maritime and territorial jurisdiction of the United States. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991). There are no *ex post facto* concerns in this case that might give us pause regarding whether Gabrion had notice.[11] Second, a reasonable actor entering a national forest would have been aware of the possibility that the federal government might have criminal jurisdiction over acts committed therein. Third, the fact that the federal government has criminal jurisdiction over some but not all of the parcels in the Manistee National Forest and that these are arrayed in a patchwork fashion does not mean Gabrion had no notice that death might be the potential penalty for first-degree murder within Manistee. Even if the federal government had

---

[10] The government cites *Camfield v. United States*, 167 U.S. 518 (1897), as an illustration of a patchwork ownership pattern between public and private land. *Camfield*, however, is not relevant to the issue of notice because the case concerned the government's regulatory powers under the Property Clause and not the question whether patchwork criminal jurisdiction violates the Due Process Clause. The government further cites two opinions from our sister circuits, which held that lack of notice to a federal employee and to an alien criminal defendant regarding the exact penalties for their acts did not violate due process. In *Farrell v. Dep't of Interior*, 314 F.3d 584, 590-94 (Fed. Cir. 2002), the Federal Circuit held that due process does not require advance notice to employees of the specific disciplinary penalties to which they may be subject. In *United States v. Miranda-Ramirez*, 309 F.3d 1255 (10th Cir. 2002), an alien criminal defendant challenged the recommended terms of his imprisonment for unauthorized reentry into the United States after he was deported following conviction for an aggravated felony. *Id.* at 1257-58. Nevertheless, the Tenth Circuit rejected the defendant's claim that his sentence violated due process because it exceeded the potential sentence incorrectly cited on a form provided to the defendant when he was deported. *Id.* at 1261. These cases are not dispositive. Federal imposition of the death penalty implicates far greater due process concerns than an administrative agency's disciplinary actions, at issue in *Farrell*. And the holding of *Miranda-Ramirez*—that an alien had no due process right to expect that a criminal penalty would be the same as the one cited on a deportation form years earlier—does not speak to an individual's due process right to notice of the potential penalties for his crime before he commits it. Lastly, the government cites *United States v. Van Chase*, 137 F.3d 579, 582 (8th Cir. 1998), which held that a federal district court had jurisdiction so long as sufficient evidence of acts within Indian territory existed to make out the elements of the offense and that, accordingly, the court could admit evidence of events that took place outside of Indian territory to show the context of the crime. *Van Chase*, likewise, does not help us resolve the issue at hand, which is not evidentiary but Constitutional in nature.

[11] In support of his argument that he lacked notice regarding the potential punishment of death, Gabrion compares the instant case to *Dobbert v. Florida*, 432 U.S. 282 (1977), in which the Supreme Court found that the criminal defendant had such notice. *Dobbert*, however, sheds no light on the instant case. In *Dobbert*, the Supreme Court held that a procedural rather than a substantive change to a statute providing for a criminal punishment did not violate the Constitutional prohibition on *ex post facto* application of the law. *Id.* at 293-95. The Court also held that the Florida statute allowing for the death penalty, which operated at the time that the defendant committed his crime, gave him "fair warning" that he might be punished with death. *Id.* at 297-98. The fact that Florida subsequently revised the statute, after the defendant committed murder but before his trial, did not violate the prohibition on *ex post facto* laws. *Id.* Similar *ex post facto* concerns to the ones at issue in *Dobbert* are not present here.

criminal jurisdiction over the entirety of the Manistee National Forest, at some seemingly arbitrary geographic point a person would cross over from the area of Michigan's criminal jurisdiction to the area of concurrent federal jurisdiction. If that person committed first-degree murder on one side of the line, he could not receive the death penalty; if the same person committed first-degree murder on the other side of the line, he might receive the death penalty. The jurisdictional consequences of committing first-degree murder within or outside of the Oxford Lake parcel is in no significant respect more arbitrary than the jurisdictional consequences of the same act were there no patchwork jurisdiction within the Manistee National Forest. In conclusion, I do not think the patchwork jurisdiction in the Manistee National Forest violates Gabrion's right to due process or equal protection under the Fifth Amendment.

## IV. DID THE UNITED STATES PRESENT SUFFICIENT EVIDENCE FOR THE JURY TO FIND THAT GABRION DROWNED TIMMERMAN IN THE OXFORD LAKE PARCEL, PURCHASED BY THE FEDERAL GOVERNMENT IN JULY 1939?

The government's theory of the case is that Timmerman was alive when Gabrion bound her with chains and padlocks, connected the chains to cinder blocks to weigh her down, took her into a boat, and dumped her into Oxford Lake to drown.[12] By contrast, Gabrion argues that the government failed to prove beyond a reasonable doubt that Timmerman drowned in Oxford Lake, or even that her death took place on federal property. Gabrion claims that assuming *arguendo* that the federal government possesses criminal jurisdiction over the Oxford Lake parcel, the government has not proved the factual foundation necessary to establish criminal jurisdiction. Had Gabrion killed Timmerman outside of the Manistee National Forest, or in a different parcel of land within Manistee, and then dumped her body into Oxford Lake, the federal government would not necessarily have jurisdiction over the land where the murder took place. Thus, according to Gabrion, if the federal government did not present sufficient evidence to prove beyond a reasonable doubt that Gabrion drowned Timmerman in the Oxford Lake parcel, then the government would also not be able to establish criminal jurisdiction in this case.

The issue of what standard to apply in reviewing the district court's finding of jurisdiction is complicated because the question of jurisdiction is intermeshed with the merits of the case, as the location of the murder is an element of the offense under 18 U.S.C. § 1111(b). In its June 2001 opinion, the district court had cited *United States v. Prentiss*, 206 F.3d 960, 967 (10th Cir. 2000), for the proposition that "[t]he fact that the alleged offense occurred within the special maritime and territorial jurisdiction of the United States is an element of the crime that must be alleged in the indictment and established at trial." J.A. at 202 (6/11/01 Dist. Ct. Op. at 2). Subsequent to the district court's opinion, however, the Tenth Circuit sitting en banc reversed *Prentiss*, holding that the indictment's failure to allege an element of the offense in that case did not strip the district court

---

[12] The superseding indictment dated February 14, 2002 no longer contained the language present in the original indictment, J.A. at 82, alleging that Gabrion drowned Timmerman in Oxford Lake. Instead, the superseding indictment alleged that Gabrion "did, after deliberation, premeditation and malice aforethought, willfully kill Rachael Timmerman within the special maritime and territorial jurisdiction of the United States, specifically in the Manistee National Forest." J.A. at 83. In his supplemental brief before this court, Gabrion argued that because the federal government had not accepted jurisdiction over the parcels of land within the Manistee National Forest acquired after 1940, the federal government had not produced evidence sufficient to show Gabrion murdered Timmerman within the special maritime and territorial jurisdiction of the United States. In response, the federal government's brief argued that the evidence presented at trial sufficed to prove beyond a reasonable doubt that Gabrion drowned Timmerman in the Oxford Lake parcel, which the district court had determined to be within the special maritime and territorial jurisdiction of the United States. Accordingly, even though the superseding indictment did not allege specifically that Gabrion drowned Timmerman in the southern third of Oxford Lake, this factual contention is the focus of our inquiry regarding whether the evidence is sufficient to establish jurisdiction.

of subject-matter jurisdiction. *United States v. Prentiss*, 256 F.3d 971, 973 (10th Cir. 2001) (en banc). The sufficiency of the indictment, however, is not at issue in this case.

Nevertheless, in evaluating the jurisdictional issue we must review both legal conclusions of the district court and factual conclusions of the jury. The district court held in its June 2001 opinion that Oxford Lake is within the territorial jurisdiction of the United States as defined under 18 U.S.C. § 7(3), and the jury concluded that Gabrion murdered Timmerman within the territorial jurisdiction of the United States, as defined in the jury instructions. On remand, the district court held further "that the Weeks Act permitted the United States to obtain concurrent jurisdiction over national forest lands; that the State of Michigan granted concurrent jurisdiction to the United States over national forest lands;" and that no evidence rebuts the presumption that the United States accepted jurisdiction over the Oxford Lake parcel when it purchased the parcel in 1939. *United States v. Gabrion*, No. 1:99-CR-76, 2006 WL 2473978, at *10 (W.D. Mich. Aug. 25, 2006).

Despite the Tenth Circuit's en banc opinion in *Prentiss*, we may still consider whether we find persuasive the dicta in the panel opinion in *Prentiss* stating that "[w]hile the court may determine, as a matter of law, the existence of federal jurisdiction over a geographic area, whether the locus of the offense is within that area is an essential element that must be resolved by the trier of fact." *Prentiss*, 206 F.3d at 967. Following a similar line of reasoning, the Ninth Circuit rejected the federal government's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b) for lack of subject-matter jurisdiction, in a case that involved a "jurisdictional requirement [that was] also a substantive element of the offense charged." *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993) (holding that when the issue of subject-matter jurisdiction is "intermeshed" with the merits of the case, jurisdiction "should be determined at trial") (quoting *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1046, 1048 (11th Cir.), *cert. denied*, 484 U.S. 969 (1987)). The Eleventh Circuit opinion, which the Ninth Circuit opinion quoted in reaching its holding, is also cited positively in Charles Alan Wright & Arthur R. Miller, 1A *Federal Practice & Procedure: Criminal* § 194 (3d ed. 2001) for the proposition that a "court may defer its ruling [on a Rule 12 motion] if factual matters will be developed at trial that are relevant to the decision." *Id.* at § 194 & n.1. Even if I were to agree that under the above precedent the district judge appropriately denied Gabrion's motion to dismiss, in part because the factual findings related to jurisdiction were the province of the jury, that would not resolve the question of what standard to apply in reviewing the district court's finding of jurisdiction.

Whether the government proved that Gabrion murdered Timmerman on a parcel of national forest land over which the federal government has criminal jurisdiction is an element of the offense, which the government must prove to the jury beyond a reasonable doubt. *United States v. Gomez*, 87 F.3d 1093, 1095 (9th Cir. 1996) (prosecution must prove to the jury, beyond a reasonable doubt, a jurisdictional element requiring that the building damaged in the charged arson had substantial connection to interstate commerce); *Parker v. Ward*, 622 F.2d 298, 302-08 (8th Cir.), *cert. denied*, 449 U.S. 851 (1980) (for federal robbery and murder statutes, location in which crime took place is a jurisdictional element that must be proven beyond a reasonable doubt). The government's burden of proof regarding the elements of the offense, however, also does not answer the question of what standard of review we are to apply in responding to Gabrion's argument that the government did not prove he had drowned Timmerman in Oxford Lake *insofar as Gabrion's argument requires us to review the district court's finding of jurisdiction*.

There are two possible standards of review that we may consider applying. Were we responding to Gabrion's sufficiency-of-the-evidence requirement in relation to the *merits* of the case, we would need to apply the deferential standard set forth by the Supreme Court in *Jackson v.*

*Virginia*, 443 U.S. 307 (1979).**[13]**  Under the *Jackson* standard, we would determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  I find it significant, however, that we are not now reviewing the merits of the case and are instead reviewing the district court's finding of jurisdiction.  I therefore think that it may be inappropriate to apply the extremely deferential *Jackson* standard.  Instead, we might apply the standard ordinarily used when we review a district court's determination regarding jurisdiction.  Under this standard, we would review the district court's legal conclusions de novo and the district court's factual determinations for clear error.  *Certain Interested Underwriters at Lloyd's, London v. Layne*, 26 F.3d 39, 41 (6th Cir. 1994) ("In reviewing the district court's determination concerning its jurisdiction, we review the court's findings of fact for clear error and conclusions of law de novo.");  *see also E.W. Scripps Co. & Subsidiaries v. United States*, 420 F.3d 589, 596 (6th Cir. 2005); *Thomas v. Woolum*, 337 F.3d 720, 725 (6th Cir. 2003).  We do not have occasion to resolve the issue of which standard to apply today, because under either standard we would need to affirm the jury or the district court's factual conclusions supporting jurisdiction.

Were we to apply the *Jackson* standard, we would look to the trial evidence.  The trial evidence demonstrated that Timmerman's body was found in Oxford Lake, approximately seventy-five to one-hundred feet from shore, 4 Joint Appendix ("J.A.") at 1004 (Trial Tr. at 951:13-16), and approximately 227 feet from the boundary line of the Manistee National Forest.  4 J.A. at 1172 (Trial Tr. at 1187: 15-16).  That portion of the lake contained a very thick mat of vegetation that made it difficult to get to the body.  4 J.A. at 1007 (Trial Tr. at 954:18-21); 1014-15 (Trial Tr. at 961:1-962:4); 1031 (Trial Tr. at 990:11-23).  Both the fisherman who discovered the body and the police who recovered it testified that the thickness of the vegetation rendered it impossible for the body to have floated to that location from the northern portion of the lake.  4 J.A. at 1014 (Trial Tr. at 961:13-23); 1048-49 (Trial Tr. at 1007:24-1008:4).

The trial evidence indicated that Timmerman's limbs were restrained with handcuffs, chains, and locks, and that her body was weighed down with cement blocks.  4 J.A. at 1040-41, 1043 (Trial Tr. at 999-1000, 1002).  Further, her mouth and eyes were covered with duct tape wrapped around her head.  4 J.A. at 1010 (Trial Tr. at 957:10-18); 1044 (Trial Tr. at 1003:14-46); 1060-61 (Trial Tr. at 1019:22-1020:8).  While investigating the crime, police recovered duct tape on the road approaching the lake, 4 J.A. at 1029 (Trial Tr. at 988:21-23).

The coroner testified that drowning was the most likely cause of death, 4 J.A. at 1228-47 (Cohle Test. at 7-35), and that Timmerman's body had likely been in the water for three to four weeks before it was discovered, 4 J.A. at 1234 (Cohle Test. at 16:14-15).  He explained that drowning is a diagnosis of exclusion that required him to reject other causes of death, 4 J.A. at 1232 (Cohle Test. at 13:11-24), and that he examined Timmerman's neck and face and found no evidence of asphyxiation, 4 J.A. at 1240-43 (Cohle Test. at 22-25).  However, on cross-examination, he also testified that he "can't rule out that she was asphyxiated, for example, at some other time and then dumped into the lake."  4 J.A. at 1247 (Cohle Test. at 35:15-17).

Finally, three witnesses testified at trial that Gabrion told each of them separately either that he had killed a woman by drowning her in a lake or that if he were to kill someone, he would do so in that manner.  An old acquaintance of Gabrion from childhood, Lloyd Westcomb, testified that Gabrion told him that Gabrion "had gotten rid of his girlfriend permanently . . . that he bound her down, threw her over the boat in a lake, something like that."  4 J.A. at 1271 (Trial Tr. at 1355: 8-11).  Another long-time acquaintance of Gabrion, Floyd Wismar, testified that Gabrion once told

---

**[13]** In *Gomez*, the Ninth Circuit declined to resolve the issue of which standard of review should apply, despite concluding that the prosecution must prove the element beyond a reasonable doubt at trial.  87 F.3d at 1097 n.3 (upholding the existence of a jurisdictional element even under a standard of de novo review for questions once of law).

him: "something real close to the effect that it's not hard to get rid of somebody; you just weight 'em down and throw 'em in a lake." 4 J.A. at 1326 (Trial Tr. at 14: 4-6). Gabrion's nephew, Michael Gabrion, Jr. testified that Gabrion had said on four or five occasions that if he ever killed someone he would do so by wrapping the person in chicken wire and chains, weighting the person with bricks, and throwing the person in a lake. 4 J.A. at 1337 (Trial Tr. at 42: 5-19).

The evidence presented at trial was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Timmerman drowned in Oxford Lake. Although the coroner said that he was unable to "rule out" asphyxiation as the cause of death, he also offered detailed testimony as to why he thought asphyxiation was unlikely. From this, a reasonable jury could conclude beyond a reasonable doubt that Timmerman drowned. The jury also could have concluded beyond a reasonable doubt that Timmerman drowned in the Oxford Lake parcel, ie., the portion of the lake owned by the federal government. The uncontroverted testimony that the thick bed of weeds north of where her body was found renders it extremely unlikely that Timmerman's body drifted southward over 227 feet, from privately controlled waters to the location where it was found. Accordingly, a jury could conclude that the murder took place within the federal government's jurisdiction. For these reasons, the government presented sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Gabrion murdered Timmerman on federal property that lies within the territorial jurisdiction of the United States. Thus, we would reject Gabrion's sufficiency-of-the-evidence argument under the *Jackson* standard.

Were we to review the district court's factual determinations for clear error we would also need to uphold the district court's conclusion that it had subject-matter jurisdiction over Gabrion's prosecution pursuant to § 1111. In its June 2001 opinion ruling on Gabrion's motion to dismiss for lack of subject-matter jurisdiction, the district court addressed "[t]he government's theory of jurisdiction . . . based upon its assertion that because it owns the bed of the southern one-third of Oxford Lake, it has jurisdiction over crimes committed in that portion of the lake." J.A. at 208 (6/11/01 Dist. Ct. Op. at 8). The district court concluded that "[b]ecause there is no question that the federal government owns the bed of the southern one-third of Oxford Lake, it also has jurisdiction over crimes occurring in the space immediately above the bed." J.A. at 211 (6/11/01 Dist. Ct. Op. at 11). In the same opinion, the district judge stated that he would not make a finding regarding the location of the alleged murder because that was an element of the offense to be resolved by the jury. J.A. at 212 (6/11/01 Dist. Ct. Op. at 12). Following trial, however, in its August 2006 opinion on remand, the district court did make findings of fact related to jurisdiction. In addition to addressing the questions of law regarding jurisdiction, the district court analyzed the evidence presented at trial under a preponderance of the evidence standard and determined "that the United States had jurisdiction to prosecute crimes occurring on the Oxford Lake parcel of the Manistee National Forest." *Gabrion*, 2006 WL 2473978, at *10. This statement makes obvious that the district court concluded as a factual matter that Gabrion killed Timmerman by drowning her in the Oxford Lake parcel. The district court reached this factual determination in accord with the jury's conviction of Gabrion for killing Timmerman within the territorial jurisdiction of the United States. I think the trial evidence that I reviewed above requires us to conclude that the district court's factual determination that Gabrion drowned Timmerman in the southern third of Oxford Lake did not amount to clear error. Accordingly, Gabrion's sufficiency-of-the-evidence argument fails.

**V. DID THE DISTRICT COURT ERR BY INSTRUCTING THE JURY
THAT GABRION MURDERED TIMMERMAN WITHIN THE
SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF
THE UNITED STATES IF HE MURDERED HER ON
PROPERTY OWNED BY THE UNITED STATES?**

Gabrion argues that the district court gave the jury an erroneous instruction regarding jurisdiction in violation of his right to a fair trial under the Fifth and Sixth Amendments. The district court instructed the jury that: "If you find beyond a reasonable doubt that the government has proven that the location of the alleged murder occurred on property owned by the United States, you are instructed that such property is within the special maritime and territorial jurisdiction of the United States." Gabrion argues that the jury instruction fundamentally misconstrued the law because it did not allow for the possibility that Gabrion murdered Timmerman on a parcel of federal land in the Manistee National Forest, which the federal government acquired after 1940 and for which it did not accept jurisdiction.

Although we correct "defects in subject-matter jurisdiction . . . regardless of whether the error was raised in district court," *United States v. Cotton*, 535 U.S. 625, 630 (2002), the jury-instruction issue does not itself raise a defect in subject-matter jurisdiction but rather raises the question of whether the jury properly found the factual foundation necessary to establish federal criminal jurisdiction. Therefore, because Gabrion's counsel did not object to the jury instructions at trial, we review the instructions for plain error. *United States v. Donathan*, 65 F.3d 537, 540 (6th Cir. 1995); FED. R. CRIM. P. 52(b). "Under that test, before an appellate court can correct an error not raised at trial, there must be (1) 'error,' ( 2) that is 'plain,' and 3) that 'affect[s] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). When these three conditions are satisfied, we may exercise our discretion to "correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

The district court's jury instruction constituted an error under the first part of the test because, as I have explained *supra*, federal ownership of national forest land is not synonymous with federal criminal jurisdiction. The district court's jury instruction ignored the possibility that the jury might conclude that Gabrion murdered Timmerman on a parcel within the Manistee National Forest that the federal government owned but over which it did not have criminal jurisdiction.

Whether the district court's error was "plain" under the second part of the test set forth in *Olano* involves a more complicated inquiry. "A 'plain error' is one that is clear or obvious." *United States v. Oliver*, 397 F.3d 369, 379 (6th Cir. 2005) (citing *Olano*, 507 U.S. at 734). For us to consider the error plain, however, the error does not need to be obvious at the time of the trial but rather can become obvious pending appeal. *Id.* An error may be plain "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal." *Johnson*, 520 U.S. at 468. The Supreme Court's decision in *Johnson* and our decision in *Oliver* thus stand for the proposition that although the law regarding 16 U.S.C. § 480 and 40 U.S.C. § 255—specifically, the relationship between the timing of the federal government's acquisition of a parcel of land and federal criminal jurisdiction—may not have been clear at the time of trial, the jury instruction may still have constituted plain error.

The instant case, however, differs in an important respect from the procedural histories of *Johnson* and *Oliver*. In those cases, intervening Supreme Court decisions changed the law between the time of trial and that of the defendants' appeals. *Johnson*, 520 U.S. at 467 (explaining that an intervening decision requiring the issue of materiality to be submitted to the jury made the judge's resolution of the issue plain error); *Oliver*, 397 F.3d at 379 (explaining that the Supreme Court's

decision in *Booker* made clear that the defendant's sentence in district court violated his Sixth Amendment rights). By contrast, in the instant case, no intervening Supreme Court or Sixth Circuit decision has made plain the error in the jury instruction's description of the relationship between federal ownership of land and federal criminal jurisdiction. The only decision to make clear that error is our judgment today.

We do not need to resolve this issue today, however, because even if we were to conclude that the jury instructions constituted plain error, the error did not affect Gabrion's substantial rights. "In most cases [for an error to affect a defendant's substantial rights] the error must have been prejudicial." *United States v. Webb*, 403 F.3d 373, 382 (6th Cir. 2005) (quoting *Olano*, 507 U.S. at 734), *cert. denied*, 546 U.S. 1126 (2006). All the evidence at trial related to the prosecution's theory that Gabrion drowned Timmerman in the southern portion of Oxford Lake over which the federal government has criminal jurisdiction. In addition to the physical evidence regarding the location and condition of Timmerman's body when it was discovered, the testimony of the coroner, and the testimony of Westcomb, Wismar, and Michael Gabrion, Jr., additional evidence also placed Gabrion at or near Oxford Lake. Pearl Hall and Ron Hall testified that when they were driving to Oxford Lake in June 1997 in preparation for turtle-trapping season, they encountered a pick-up truck driven very fast in the other direction, with a boat sticking out the back of it. J.A. at 1252-59 (Trial Tr. at 1306-32). Pearl Hall testified that Gabrion was driving the truck. J.A. at 1256 (Trial Tr. at 1320: 16-19). Ron Hall testified that when he subsequently got out of his own vehicle to look at the lake, he saw "marks where someone had drug [sic] one [boat] out of there." J.A. at 1261 (Trial Tr. at 1333: 6). Kathy Kirk testified that when she visited Oxford Lake with her mother in June 1997, they saw at the lake a pick-up truck with a boat in the back with two men and one woman in it. J.A. at 1396-1401 (Trial Tr. at 1574-79). Kirk testified that Gabrion was one of the men in truck that day, J.A. at 1401 (Trial Tr. at 1579: 3-14), and that she recognized the woman later when she saw her pictures in the news as the woman drowned in Oxford Lake (Timmerman). J.A. at 1404 (Trial Tr. at 1582: 1-11).

I therefore agree with the government that the theory of the prosecution and the government's evidence made it permissible for the district court to instruct the jury that if Gabrion murdered Timmerman on federally owned property, then he did so within the special maritime and territorial jurisdiction of the United States. An instruction that referenced other parcels of federally owned land within the Manistee National Forest and the jurisdictional consequences of that land would perhaps have confused the jury. Gabrion argues that the prosecution also presented evidence regarding the two-track roads that lead to Oxford Lake, which cross parcels of land over which the federal government does not have jurisdiction. *See* J.A. at 1015, 1022-25, 1029, 1088, 1105, 1252-53 (Trial Tr. at 962: 22-23, 981-84, 988: 22-23, 1057: 2-7, 1099: 17-23, 1306-1307). But no evidence presented by either the prosecution or the defense suggested that Gabrion might have murdered Timmerman on one of these other parcels of land. Based on the evidence presented at trial, if the jury found that Gabrion murdered Timmerman on federal property, it must have necessarily also found that Gabrion murdered Timmerman by drowning her in the southern portion of Oxford Lake owned by the federal government.

## VI.  CONCLUSION

For the reasons explained above, I concur in the judgment affirming the district court's holding that the federal government has jurisdiction to prosecute Gabrion pursuant to 18 U.S.C. § 1111 in the federal courts. I think that the relevant precedent and facts make clear that 16 U.S.C. § 480 does not preclude concurrent federal and state criminal jurisdiction over national forest lands. Furthermore, because the federal government purchased the Oxford Lake parcel prior to 1940 there exists a presumption that the federal government accepted legislative jurisdiction over the parcel, and Gabrion has not presented persuasive evidence rebutting this presumption. Thus, the southern third of Oxford Lake where the jury concluded that Gabrion murdered Timmerman lies within the

special maritime and territorial jurisdiction of the United States as defined by 18 U.S.C. § 7(3). The patchwork character of the federal criminal jurisdiction in the Manistee National Forest does not violate the Fifth or Eighth Amendments. The government presented sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Gabrion murdered Timmerman by drowning her in the portion of Oxford Lake owned by the federal government. Finally, the district court's instructions to the jury did not constitute plain error affecting Gabrion's substantial rights. Therefore, the federal government had jurisdiction to prosecute Gabrion for murder pursuant to 18 U.S.C. § 1111.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting.  Although it may seem at first glance somewhat counterintuitive to say that the federal courts do not have general or plenary subject matter jurisdiction over murder and other crimes in the national forests, that is, in fact, the situation.  That is the situation because our system of federalism requires that Congress act by clear positive legislation to create such criminal jurisdiction, and Congress has not done so.  There is no common-law, federal criminal, subject-matter jurisdiction in national forests or elsewhere, and this concept has been a part of our system of checks and balances limiting the power of the federal government from the beginning.[1]

Instead Congress has by positive legislation in 16 U.S.C. § 480 sought affirmatively to maintain the jurisdictional *status quo ante* when the federal government acquires and creates national forest lands.  Once the several constitutional and statutory provisions pertaining to federal *legislative* and *judicial* jurisdiction over national forests are parsed and understood, it should become clear that my colleagues' solution to the problem will not bear close analysis.  Not only that, but my colleagues' claim of general federal criminal jurisdiction is directly contrary to the position that the Forest Service and the Lands Division of the Department of Justice adopted many years ago, as I will explain at the end of this opinion, once I have led the reader through a reasoned analysis of the pertinent statutory and constitutional provisions.

## I.  Section 480, Title 16, Specifically Regulates Federal Jurisdiction Over National Forests

The subject-matter jurisdiction defense raised by the defendant Gabrion is based on the "Organic Administration Act of 1897,"[2] combined with the "Weeks Act" of 1911, which are now codified together as 16 U.S.C. § 480:

> *The jurisdiction, both civil and criminal, over persons within national forests, shall not be affected or changed by reason of their existence, except so far as the punishment of offenses against the United States therein is concerned*; the intent and meaning of this provision being that the State wherein such national forest is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State.

---

[1] *See United States v. Hudson & Goodwin*, 7 Cranch 32, 34 (1812) ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offense.").

[2] The Supreme Court has described the purpose of this Act as follows:

From the various acts relating to the establishment and management of forest reservations it appears that they were intended "to improve and protect the forest and to secure favorable conditions of water flows."  It was declared that the acts should not be "construed to prohibit the egress and ingress of actual settlers" residing therein [and] not "to prohibit any person from entering the reservation for all proper and lawful purposes, including that of prospecting, and locating and developing mineral resources; provided that such persons comply with the rules and regulations covering such forest reservation."  (Act of 1897, c. 2, 30 Stat. 36).

*United States v. Grimaud*, 220 U.S. 506, 515 (1911).

(Emphasis added.)  The underlined sentence is in the passive voice.  The subject is the noun "jurisdiction" modified by the adjectives "civil and criminal."  This refers to the judicial authority to adjudicate civil and criminal cases.  The verbs are "to change" or "to affect," and the sentence is in the negative stating that "jurisdiction" is "not" "changed" or "affected."  The prepositional phase "within the national forests" modifies the verbs, and the meaning is that the "existence" or creation of "national forests" will not change the jurisdiction of state or federal courts, *i.e.*, that the *status quo* existing before the creation of the national forest concerning jurisdiction will continue after their creation.  The "except" clause limits the duration of that pre-existing state of affairs and makes its continuation dependent on whether Congress acts to create and define any federal "offenses . . . therein."  The conditional "except" clause requires Congress to act affirmatively to legislate criminal offenses "therein."  Unlike legislation with respect to military bases and other federal enclaves, Congress has not acted affirmatively under the Interstate Commerce, Federal Enclave or Property Clauses of the Constitution to bring murder in the "national forests" within the "special maritime and territorial jurisdiction of the United States" or any other category of federal, judicial, subject-matter jurisdiction.  In order for federal offenses within the national forests to exist, the offense must be a regular federal crime of general nationwide application or a crime specially defined and enacted by Congress within one or more national forests.  The crime of murder is not such a crime.  Congress has not made the crime of murder either generally applicable nationwide or specially applicable in one or more national forests.  There is no federal crime of murder applicable outside the "special maritime and territorial jurisdiction," and Congress has not acted to bring the national forests within that "special jurisdiction" category.

Rejecting this common sense interpretation based on our federalist tradition, the main thrust of the separate opinions of both Judge Batchelder and Judge Moore is that § 480 on national forests itself somehow provides the necessary plenary, federal "concurrent" criminal subject matter in national forests.  They derive such broad federal criminal jurisdiction directly from § 480.  That statute is the basic source of their argument in favor of jurisdiction.  Using § 480 they would read the "special maritime and territorial jurisdiction of the United States" to include all such forest lands.

Section 480 applies specifically and only to "national forests," not to any other government lands.  It states flatly and unequivocally that no change in the *status quo ante* respecting federal and state criminal jurisdiction shall occur by virtue of the acquisition or designation of lands as a "national forest."  It specifies expressly that "civil and criminal jurisdiction" in national forests, other than for general federal "offenses" applicable in the country at large, is not "affected" and does not "change" when lands become part of the national forests.

The only way my colleagues can arrive at their conclusion is by holding that only "*state* jurisdiction" does not change when a national forest is created, but that is not what the section says.  Section 480 does not say that only "*state* jurisdiction" shall not change.  It says "the jurisdiction, both civil and criminal" shall not change as a result of federal acquisition of forest land.  This language includes both state *and federal* jurisdiction over forests, and that interpretation has become well-settled by the administrative practices of the Forest Service and the Department of Justice over the past 100 years, as explained later.

Federal jurisdiction under § 480 exists only for "offenses" of general nationwide or special local application which are criminalized by a specific federal statute.  In other words, the language in § 480, "except so far as the punishment of offenses against the United States therein is concerned," means that offenses that are federal regardless of where the crime is committed within the United States are federal offenses in national forests — for example, crimes like bank robbery, counterfeiting, the sale of illegal drugs, murder of federal law enforcement officers, use of interstate facilities to commit murder for hire, and other crimes of general, nationwide application, *i.e.*, regular federal crimes.  In addition, "offenses" would include crimes specifically described and enacted by Congress for local application in one or more national forests.  The federal statute at issue in this

case, § 1111, cannot fall within the "except" clause of § 480 because § 1111(b) requires that the murder occur within "the special maritime and territorial jurisdiction of the United States," which in turn requires that Congress act to create "exclusive or concurrent jurisdiction." Congress has not asserted in § 480 or elsewhere either concurrent or exclusive jurisdiction in such cases; consequently, no territorial jurisdiction exists as defined by § 7(3).[3]

The apparent policy behind § 480 is that the national forests make up such a large percentage of the United States that it would be impossible to effectively enforce all criminal laws therein without establishing a large national police force. These lands comprise 193 million acres or 8.5% of the total land area of the United States. National forests extend across the nation from Hawaii, California and Alaska to Maine, Florida and Puerto Rico. Manistee National Forest itself occupies several counties in Western Michigan and includes private farms, lakes and home sites. The consistent administrative practice of the Forest Service and the Department of Justice, as described in Section III of this opinion, support this policy of relying on state criminal jurisdiction rather than federal jurisdiction. In addition, it would obviously be inconsistent with the long tradition of federalism and plenary state criminal jurisdiction for the government to take over the responsibility (without a clear federal statute) for law enforcement in such large, noncontiguous, scattered groups of lands throughout the United States, areas in which cities, villages, residences, farms and other private lands are interspersed with public forest lands, logging trails, recreation facilities and lakes.

Another section of the same federal, national forest statute, provides a limited *misdemeanor* exception to the "no-change-in-jurisdiction" rule of § 480 by delegating to the Secretary of Agriculture authority to "make such rules and regulations . . . to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. The statute authorizes a punishment for violations of such regulations of "not more than $500 or imprisonment for not more than six months" with the case to be "tried and sentenced by any United States magistrate judge

---

[3] My colleagues assert § 480 federal criminal jurisdiction over this federal death penalty case in the national forest under the so-called "special maritime and territorial jurisdiction of the United States" referred to in 18 U.S.C. §7(3) and 18 U.S.C. § 1111. Section 7(c) defines and limits the "special maritime and territorial jurisdiction" to lands owned by the government over which Congress has created "exclusive or concurrent jurisdiction":

§7. The term "special maritime and territorial jurisdiction of the United States," as used in this title, includes "(1) [Waters within the admiralty and maritime jurisdiction of the United States]. (2) [Vessels on a voyage on waters connected to the Great Lakes]. (3) Any lands reserved or acquired for the use of the United States, *and under the exclusive or concurrent jurisdiction thereof* . . . ."

(Emphasis added.) My colleagues rely on § 1111(b) of Title 18, which limits criminal jurisdiction to impose the death penalty to first degree murder cases committed on government property over which the government has created "exclusive or concurrent jurisdiction," the jurisdiction required by § 7(3) above. Section 1111(b) limits such federal criminal subject matter jurisdiction as follows:

(b) *Within the special maritime and territorial jurisdiction* of the United States, whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life . . . .

(Emphasis added.) To create federal criminal jurisdiction, § 1111 is totally dependent on § 7(3), which requires a federal law creating "exclusive or concurrent jurisdiction" over the "required" lands. There cannot be federal criminal jurisdiction in national forests under § 1111 unless Congress acts by positive law to assert such jurisdiction. Section 480 does the exact opposite saying that "no change" shall occur as the result of the creation of a national forest.

. . . ." *Id*. This statute provides an exception to the "no change" rule of § 480,[4] but there is no similar federal statute creating any type of federal felony jurisdiction over national forest laws.

Section 480 itself creates a specific national forest exception to a more general, statutory rule regarding acceptance of exclusive or concurrent jurisdiction over government lands. The more general statutory rule was first established by statute in 1940. It provides that concurrent federal law enforcement jurisdiction over "lands or an interest in land it acquires" may only be accepted by the federal government by the filing of formal notice that the government in fact accepts such jurisdiction.[5] The statute provides for a procedure by which federal exclusive or concurrent jurisdiction may be acquired. The statute, 40 U.S.C. § 255 (now codified as 40 U.S.C. § 3112), reads as follows:

> § 3112. Federal jurisdiction.
>
> (a) Exclusive jurisdiction not required. It is not required that the Federal Government obtain exclusive jurisdiction in the United States over land or an interest in land it acquires.
>
> (b) Acquisition and acceptance of jurisdiction. When the head of a department, agency, or independent establishment of the Government, or other authorized officer of the department, agency, or independent establishment, considers it desirable, that individual may accept or secure, from the State in which land or an interest in land that is under the immediate jurisdiction, custody, or control of the individual is situated, consent to, or cession of, any jurisdiction over the land or interest not previously obtained. The individual shall indicate acceptance of jurisdiction on behalf of the Government by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated. [No official of the federal government has ever filed such a notice with the State of Michigan asserting concurrent jurisdiction.]
>
> (c) Presumption. It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section.

(Emphasis added.) The 1940 statute modified a previous, judicially-created rule that in some circumstances the courts would "presume" that the federal government had accepted concurrent jurisdiction from a state if the government agency in charge of the land did not expressly refuse to accept jurisdiction offered by the state. *See Adams v. United States*, 319 U.S. 312, 315 (1943) (setting aside under § 255 [now § 3112] the rape convictions of three soldiers at a military base

---

[4] The National Forest Service has exercised the delegation of authority granted by this statute. *See* 36 C.F.R. § 261 — "Prohibitions" (prohibiting interfering with Forest Service officers, disorderly conduct, cutting timber and similar behavior in national forests and regulating the use of motor vehicles, fishing and hunting, etc.) No regulation issued by the Forest Service purports to accept concurrent jurisdiction under the Assimilative Crimes Act or create federal subject matter jurisdiction to enforce state criminal laws in federal court. The regulations follow the rule of § 480 that provides for no change in civil and criminal jurisdiction by virtue of the "existence" of national forests.

The National Park Service within the Department of the Interior operates under a quite different system of concurrent legislative jurisdiction which depends on contracts with state governments approved by a congressional committee. *See* 16 U.S.C. § 1a-3. ("The Secretary shall diligently pursue the consummation of arrangements with each State . . . to the end that insofar as practicable the United States shall exercise concurrent legislative jurisdiction within units of the National Park System").

[5] In 1923, the State of Michigan by statute granted to the United States "concurrent jurisdiction . . . in and over lands so acquired" for national forests. MICH. COMP. LAWS § 3.401 (2007). All concede that the federal government has never accepted such jurisdiction by notice or other action.

because the government had not accepted exclusive or concurrent jurisdiction and "concurrent jurisdiction can be acquired only by the formal acceptance prescribed in the Act"); *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 528 (1885) (acceptance of concurrent jurisdiction may sometimes be "presumed" if the federal government does not object to a state's cession of jurisdiction and no statute forecloses acceptance); *United States v. Johnson*, 426 F.2d 1112, 1114-15 (7th Cir. 1970) (affirming a burglary conviction in a Veterans Administration hospital on land acquired for naval purposes in 1918 on ground that concurrent jurisdiction would be "presumed" in the absence of an objection by the federal government). Because § 480 expressly forbids and preempts such a presumption of jurisdiction (federal "jurisdiction . . . within national forest shall not be affected or changed"), neither the pre-1940, rebuttable "presumption" of concurrent jurisdiction nor the post-1940 conclusive presumption against concurrent jurisdiction has ever been applied to national forests. Notwithstanding my colleagues' argument to the contrary, it is clear that section 480 specifically covering national forests is an exception to § 255 [now § 3112] which is applicable to other federal lands but not national forests. Even if § 255 could somehow be held applicable to the national forests, it could not create federal concurrent jurisdiction because it creates a conclusive presumption against such jurisdiction and because the forest service has consistently denied such jurisdiction, as will be discussed in Section III below.

## II. My Colleagues' Opinions are Mistaken about the Meaning of §§ 480, 1111, 7(3) and 255

In opposition to the analysis and arguments outlined above, Judges Batchelder and Moore randomly cite seven principal cases and two constitutional provisions (the "Property" and "Federal Enclave" Clauses), as well as two statutes discussed above (18 U.S.C. § 1111 and 40 U.S.C. § 255 [now § 3112]). I will discuss each one of the arguments they make and the principal authorities they rely on.

The citation and reliance on *United States v. California*, 655 F.2d 914 (9th Cir. 1980), for the proposition that federal courts automatically have concurrent jurisdiction with the states over national forests is misplaced and indicates their confusion about the meaning of § 480. In that case the federal government sued the State of California as plaintiff because State actors negligently started a fire in a national forest. Although the federal courts clearly have jurisdiction of such actions under 28 U.S.C. § 1345 (providing for "original jurisdiction of all civil actions, suits or proceedings commenced by the United States"), the court dismissed the action because the government failed to bring its negligence action within the appropriate statute of limitations. In passing, the court mentioned that it is the states, not the federal government, which have general "criminal and civil jurisdiction over national forests" under § 480. The Ninth Circuit in its dicta is simply saying — as I would hold here in respect to criminal cases — that if there is a federal statute of general nationwide application that gives federal courts civil jurisdiction over tort cases in a national forest, as does § 1345 when the federal government is the plaintiff, then federal civil concurrent jurisdiction exists along with state court concurrent jurisdiction. But if there is no federal statute like § 1345 on the civil side or a general, federal, criminal statute like one forbidding bank robbery or drug distribution or § 551 discussed above on the criminal side, then there is no federal jurisdiction. That is what § 480 means when it says no federal civil or criminal jurisdiction exists "except so far as the punishment of offenses against the United States." The Ninth Circuit's interpretation of § 480 in the California case is the same as my analysis and contrary to my colleagues' interpretation.

Likewise, my colleagues are mistaken when they say that 18 U.S.C. § 1111(b) provides federal jurisdiction over murder cases in national forests. Section 1111(b) only criminalizes murder within the "special maritime and territorial jurisdiction" covered by § 7(3), not within the national forests. Section 7(3) in turn defines this "special" jurisdiction as federal lands which by statute have been placed under the "exclusive or concurrent jurisdiction" of the federal government. My

colleagues fail to understand that in order to create murder or other criminal jurisdiction in the national forests Congress must act to do so. Instead, in § 480, Congress has expressed the opposite intent. Neither § 7(3), nor § 1111, mentions or purports to create jurisdiction over national forests, and § 480 expresses a clear intent to leave in place the *status quo* excluding such federal criminal jurisdiction and leaving it up to the states to deal with such cases, as has been the consistent practice since the national forests were established more than 100 years ago.

My colleagues also appear to suggest that the Constitution itself may directly — in a self-executing manner — somehow give the federal courts jurisdiction over murders in national forests. They seem to believe that the Federal Enclave Clause, Article I, Section 8, Clause 17 itself, without further federal legislation, creates federal criminal jurisdiction over murder cases in the Manistee National Forest. This Clause just gives Congress *the power* to create federal criminal jurisdiction over lands "purchased . . . for the erection of forts, magazines, arsenals, dock yards, and other needful building." Congress must *exercise* that power *by legislation*. The clause is not self-executing. It requires an act of Congress. In § 480 Congress has explicitly acted to decline such general jurisdiction "within national forests," stating clearly that "civil and criminal jurisdiction . . . shall not be affected or changed" by virtue of the acquisition of national forest lands. In this case, the government does not and would have no basis to claim that it has acquired such jurisdiction under this Clause of the Constitution, and no case authority exists for the exercise of such federal criminal jurisdiction under this Clause.

Likewise, the Property Clause ("Congress shall have power to dispose of and make all needful rules and regulations respecting . . . property belonging to the United States," Article IV, Section 3, Clause 2) requires an act of Congress to create general federal criminal jurisdiction over ordinary murder cases in the national forests. This clause is not self-executing. Congress must act positively by statute to create such jurisdiction.

*Kleppe v. New Mexico*, 426 U.S. 529 (1976), is the case relied upon by both judges in arguing that the Property and Federal Enclave Clauses create federal criminal felony jurisdiction in national forests. In *Kleppe*, the Supreme Court simply upheld the constitutionality of the Wild Free-roaming Horses and the Burros Act of 1971, insofar as it prohibited the state livestock board in New Mexico from entering public lands of the United States and removing wild burros under the State's estray laws. The case recognizes that the Property and Enclave Clauses are not self-executing and require specific legislation in order to regulate and create federal jurisdiction over public lands. Both judges rely heavily on *Kleppe*. Judge Batchelder argues for direct federal criminal subject matter jurisdiction from the Court's statement in *Kleppe* that the federal government may "apply derivative *legislative* power from a state pursuant to the [Enclave Clause] . . . by consensual acquisition of land, or by . . . the state's subsequent cession of legislative authority over the land." 426 U.S. at 542. The *Kleppe* opinion is clear that the Court is referring to "legislative jurisdiction" which must be exercised by statute before it is turned into federal, criminal, subject-matter, judicial jurisdiction. My colleagues appear to confuse "legislative jurisdiction" or authority, *i.e.*, constitutional authority, with federal, judicial, subject-matter jurisdiction, which may only be created by positive action of Congress.

This confusion becomes absolutely clear in footnote 5 of Judge Batchelder's opinion in which she has somehow persuaded herself to believe that § 480 is only referring to "legislative jurisdiction," not to "the federal court's subject matter jurisdiction." She states that "only . . . legislative jurisdiction . . . is actually at issue or determinative in this case." This indicates a complete misunderstanding of the issue before us. No one denies that Congress has "legislative jurisdiction" over the national forests. The Interstate Commerce, Property and Federal Enclave Clauses each provide for some legislative jurisdiction over national forests. The only question is whether Congress has acted to create "federal court's subject matter jurisdiction" over a murder case in the national forests. It is no wonder that my colleagues are mistaken in their answer to this

question when they think that the issue is one of the existence of "legislative jurisdiction." They are both quite right that there is "legislative jurisdiction" but quite wrong that there is "federal court subject matter jurisdiction."

Likewise, my colleagues are mistaken in finding support for federal jurisdiction over murders in national forests in *United States v. Raffield*, 82 F.3d 611 (4th Cir. 1996). There the Fourth Circuit in a doubtful holding stated that "the state and federal governments . . . enter[ed] into a relationship of concurrent jurisdiction" because "the Assimilative Crimes Act specifically contemplates convictions for 'operating a motor vehicle under the influence of a drug or alcohol' while on federal lands. 18 U.S.C. § 13(b)(1)." *Id.* at 613. The question of the treatment of drunk driving in national forest lands is not before us in the instant case. The Assimilative Crimes Act has provisions authorizing federal misdemeanor jurisdiction regulating traffic infractions, and § 551 of the Weeks Act has a misdemeanor provision for driving violations in national forests. Neither Act authorizes federal jurisdiction over felonies. The national forest regulations issued under § 551 make drunk driving in a national forest a federal misdemeanor. Section 13(b) of the Assimilative Crimes Act states:

> (1) Subject to paragraph (2) and for purposes of subsection (a) of this section, that which may or shall be imposed through judicial or administrative action under the law of a State, territory, possession, or district, *for a conviction for operating a motor vehicle under the influence of a drug or alcohol, shall be considered to be a punishment provided by that law.* Any limitation on the right or privilege to operate a motor vehicle imposed under this subsection shall apply only to the special maritime and territorial jurisdiction of the United States.

> (2)(a) In addition to any term of imprisonment provided for operating a motor vehicle under the influence of a drug or alcohol imposed under the law of a State, territory, possession, or district, the punishment for such an offense under this section shall include an additional term of imprisonment of not more than 1 year, or if serious bodily injury of a minor is caused, not more than 5 years, or if death of a minor is caused, not more than 10 years . . . .

(Emphasis added.) The *Raffield* case based its drunk driving jurisdiction on this specific language, a doubtful holding unless the Court intended to rely on § 551 which relates specifically to national forests. The *Raffield* case criminalizing drunk driving in a national forest is not on point. There is no language in § 13(b) or § 551 that would in any way alter § 480's rejection of concurrent jurisdiction in the national forest for murder or other state felonies.[6] My colleagues, therefore, err in "presuming" or implying general federal jurisdiction over state felonies in national forests based on the *Raffield* drunk driving case — if, in fact, this is my colleagues' purpose in citing the case.

Neither does the case of *Stupak-Thrall v. United States*, 70 F.3d 881 (6th Cir. 1995), have anything whatever to do with the question in this case. *First*, in *Stupak* the *en banc* court issued no authoritative ruling because it split four to four, which resulted in an affirmance of the District Court. *Second*, the question in the case had to do with the governmental regulation of riparian or littoral rights in private property owners in the Sylvania Wilderness Area under the Michigan Wilderness Act, Public Law No. 100-184, 101 Stat. 1274 (1987), and the Wilderness Act of 1964, 16 U.S.C. § 1132(b). Congress clearly and specifically acted by positive law to create limited

---

[6] In a recent decision, the Tenth Circuit held that federal jurisdiction did exist for a murder committed in a national forest despite the defendant's objections that § 480 precludes such an exercise of jurisdiction. *See United States v. Fields*, No. 05-7128, 2008 U.S. App. LEXIS 4018 (10th Cir. Feb. 25, 2008). The Tenth Circuit's treatment of § 480 mirrors that of my colleagues and similarly misunderstands that the Weeks Act specifically preserved the *status quo ante* absent Congressional action.

federal jurisdiction. In the Michigan Wilderness Act, Congress clearly authorized the Department of Agriculture to engage in the regulation of water craft and pollution in the Sylvania Wilderness Area. *Third*, § 480 and the question of subject matter jurisdiction in national forests were never mentioned in the case and would have been completely irrelevant to any possible issue presented there.

Equally strange is the reliance on *Hawkins v. Delo*, 977 F.2d 396 (8th Cir. 1992). In that case the Eighth Circuit held that it was the state government that had jurisdiction over murder in the national forests in opposition to the habeas petitioner's argument in a capital murder habeas case from the State of Missouri that the state court lacked jurisdiction over a murder committed in the Mark Twain National Forest. In direct opposition to my colleagues' claim, the Eighth Circuit said that "even when the state purports to cede land to the federal government, the United States does not have jurisdiction unless it accepts it," 977 F.2d at 398, a conclusion equivalent to holding that only the state had jurisdiction over murder cases in the Mark Twain Forest — the same conclusion I reach here.

The cases of *Silas Mason Co. v. Tax Commission*, 302 U.S. 186 (1937), and *Benson v. United States*, 146 U.S. 325 (1892), also have no bearing on this case. They do not even involve jurisdiction in national forests or purport to deal with § 480 or any law relevant to national forests.

Finally, my colleagues' expansion of "concurrent," federal, subject-matter jurisdiction in the national forests to include state criminal laws would make all of the laws of the states referred to in § 13 (the Assimilative Crimes Act) apply as federal crimes in federal court: State laws ranging from zoning and land use to hunting and fishing to auto, driver's and occupational licensing would all create federal judicial jurisdiction — an unheard of expansion of federal jurisdiction that would create general federal court jurisdiction over the enforcement of all state laws in all 193 million acres of the national forests.

### III. The Administrative Agency in Charge of the National Forests Has Consistently Opposed Federal Concurrent Jurisdiction

In the past the U.S. Department of Agriculture, which operates the national forests, as well as the Department of Justice and other agencies of the federal government, have interpreted § 480 to preclude federal jurisdiction over general state crimes like murder committed in national forests. The record reflects the following legislative, executive and administrative agency opinions stating that § 480 negates and prohibits the exercise of either exclusive or concurrent federal jurisdiction over state crimes committed in national forests.

#### 1. Opinion of Robert H. Shields, Solicitor General, U.S. Department of Agriculture, Opinion 4311, July 18, 1942, (filed as Defendant's Exhibit B):

"It is our opinion, therefore, that § 480, *supra*, precluded the exercise of concurrent jurisdiction as well as exclusive jurisdiction by the United States over national forest lands . . . ."

#### 2. Opinion of Attorney General Herbert Brownell, Jr., to President Eisenhower, April 27, 1956, Re: "Jurisdiction Over Federal Areas Within the States" (filed as Defendant's Exhibit D):

The Attorney General's report notes: "Where the Federal Government has no legislative jurisdiction over its land, it holds such land in a proprietorial interest only and has the same rights in the land as does any other landowner." Defendant's Exhibit B, p. 21. The report notes at pages 64 and 101 that the Department of Agriculture Forest Service holds almost all of its lands in "proprietorial" ownership.

### 3. Follow-Up Opinion of Attorney General Herbert Brownell, Jr. to President Eisenhower, June, 1957, Re: "Jurisdiction Over Federal Areas Within the States" (filed as Defendant's Exhibit E p. 114):

> "*State criminal jurisdiction retained.* — State criminal jurisdiction extends into areas owned or occupied by the Federal Government, but as to which the Government has not acquired exclusive legislative jurisdiction with respect to crimes. And as to many areas owned by the Federal Government for its various purposes it has not acquired legislative jurisdiction. The forest service of the Department of Agriculture, for example, in accordance with a provision of Federal law (16 U.S.C. 480), has not accepted the jurisdiction proffered by the statutes of many states, and the vast majority of federal forest lands are held by the Federal Government in a proprietorial status only."

*Id.* at 114.

### 4. Opinion of W. Mone, Office of General Counsel, U.S. Department of Agriculture, May 29, 1963, (Defendant's Exhibit H):

> "The United States has neither concurrent or exclusive jurisdiction over the national forest lands, but holds such lands in a proprietary capacity only. (Reference: Op. Sol. 2979, dated December 18, 1940; Op. Sol. 4311, dated July 18, 1942; and Op. Sol. 4658, dated April 27, 1943.) The proprietary capacity means merely that the United States owns the land, insofar as legislative and law enforcement jurisdiction is concerned, in the same manner that an individual owns land . . . . In no case where national forest lands, acquired under the Weeks Law, are involved have there been jurisdiction accepted by the United States."

### 5. Report on "Federal Legislative Jurisdiction" of the Public Land Law Review Commission, incorporating the Report and opinion of the Land and Natural Resources Division of the U.S. Depart of Justice, September, 1969. The Public Land Law Review Commission consisted of 18 members, 6 each appointed by the Senate, the House and the President (filed as Defendant's Exhibit 3, p. 77):

"The Weeks Forestry Act of 1911 (16 U.S.C. § 480), a statute which authorizes acquisition of privately owned land for national forest purposes, provided against change of jurisdiction by reason of such acquisition." The report at page 75 lists "only seven of the Forest Service's 245 properties [that] contain other than proprietorial jurisdiction," none of which are in the Manistee National Forest. These seven are exceptions because the federal government had previously acquired them as arsenals, military bases or courthouses over which it has asserted concurrent or exclusive jurisdiction before converting them to national forest lands.

\*     \*     \*

I believe that the language of section 480 itself is clear that federal jurisdiction does not exist in murder cases in national forests, including the Manistee National Forest. Basically, the statute says that such cases should be tried in state court because ordinary criminal jurisdiction "shall not be affected or changed." But if there were ambiguity or doubt, well settled principles of administrative law require that we give deference to administrative interpretations of statutes that the agency administers, for as Justice Stevens wrote for the Court in *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984):

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations

> "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulation [citations omitted]."

Therefore, the clear language of § 480 itself, plus the consistent administrative interpretation of the statute over the last 100 years, leaves no room for doubt as to the question of jurisdiction in this case. The federal government has not heretofore asserted or accepted concurrent jurisdiction over murder cases or other state-law-type felony cases in the national forests. Normal principles of federalism still apply, leaving such crimes to the state courts to deal with under state laws.

In the face of the clear language of § 480 rejecting federal concurrent jurisdiction in national forests, longstanding principles of federalism relying on the states for general enforcement of the criminal law, the policy reasons against creating a large national forest service police force to enforce state laws, and the longstanding rejection of such jurisdiction by federal executive agencies, the District Court, the government and my colleagues have erred in "presuming" federal jurisdiction and giving § 480 a meaning opposite to congressional intent to maintain the *status quo ante* regarding general criminal jurisdiction in the national forests.